UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

M.M., by and through
her Parent and Natural
Guardian, L.R.,

        Plaintiff,

   vs.                    REPORT AND RECOMMENDATION

Special School District
No. 1, Minneapolis,
Minnesota, Minneapolis
School Board,

        Defendants.        Civ. No. 05-2270 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Plaintiff's Motion for an Award of Attorney's Fees and Costs, and the Defendants' Motion for Summary Judgment. A Hearing on the Motions was conducted on March 7, 2006, at which time, the Plaintiff[1] appeared by Margaret O'Sullivan Kane, Esq., and the Defendants appeared by Laura Tubbs Booth, Esq.

---

[1]Since the Plaintiff's action is prosecuted on her behalf by L.R., we employ the term "Plaintiff" to jointly refer to L.R., and M.M.

For reasons which follow, we recommend that the Defendants' Motion for Summary Judgment be granted, in part, and that the Plaintiff's Motion for Costs and Attorney's Fees be granted, in part.

II. <u>Procedural and Factual Background</u>

A. <u>Procedural Posture</u>.   Pursuant to the Individuals with Disabilities Education Act, <u>Title 20 U.S.C. §1400</u>, <u>et</u> <u>seq</u>. ("IDEA"), the Federal Government ensures that students with disabilities receive a "free, appropriate public education" ("FAPE").  See, <u>Title 20 U.S.C. §1400(d)(1)(A)</u>.   The IDEA imposes extensive procedural and substantive requirements on participating State and local agencies to safeguard a disabled student's right to FAPE.  Among the procedural safeguards that are mandated by the IDEA, Section 1415(f) requires that an independent Due Process Hearing be conducted by a State, or local educational agency, so as to insure that the parents of handicapped children will be afforded an opportunity to register their complaints concerning a public school's evaluation, or the educational placement of their child.  See also, <u>Title 20 U.S.C. §1415(b)(6)</u>.  Pursuant to the Act, the State of Minnesota has promulgated Rules which create a procedure for the conduct of such Hearings.  See, <u>Minnesota Statutes Section 120A.091, Subdivision 12</u>; <u>Minnesota Rule 3525.4300</u>; see also, <u>Honig v. Doe</u>, 484 U.S. 305, 311-12 (1987)(The procedural safeguards "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate.").

- 2 -

In accordance with Minnesota law, a Due Process Hearing was completed below, in which, an Administrative Law Judge ("ALJ"), who was appointed by the Minnesota Commissioner of Education, see, <u>Minnesota Rule 3525.3900, Subpart 5</u>, heard three days of testimony, and concluded that the Defendants Special School District No. 1, and the Minneapolis School Board (collectively "the District"), had failed, in certain respects, to provide M.M. with a FAPE, as is required by the IDEA. As a result, the ALJ directed the District, among other things, to provide M.M. with compensatory educational services.

The Plaintiff subsequently commenced this action by filing a Complaint seeking costs and attorney's fees, pursuant to Title 20 U.S.C. §1415(i)(3)(B)(i)(I), which provides, as follows:

> In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys fees as part of the costs * * * to a prevailing party who is the parent of a child with a disability.

The Plaintiff  contends that she was the "prevailing party" in the proceedings below and, as a result, she is entitled to an award of costs and attorney's fees.  The District has challenged the Plaintiff's assertion that she was the "prevailing party" in the administrative proceeding, and has filed a Counterclaim, which appeals all aspects of the ALJ's decision in the underlying administrative proceeding, with the exception of M.M.'s placement in the Federal Setting III Program at the Barton Open School, and specifically challenges the ALJ's award of compensatory education benefits for the

2003-04 and 2004-05 school years.  The Plaintiff has moved for Summary Judgment on her request for an award of costs and attorney's fees, and the District has moved for Summary Judgment on its Counterclaim -- that is, its appeal of the ALJ's decision.

       B.    <u>Factual Background</u>.  As related by the ALJ, M.M. is a 14-year old resident of the District, who has attended school in the District for all but approximately three weeks -- from September 7, 2004, until September 27, 2004 -- when her mother, L.R., enrolled her in the Colonel Charles Young Military Academy. [Transcript ("T.") 306, and 311, District's Exhibit ("D.") 707].  M.M. was initially found eligible for special education services in the third grade, while she was attending Jordan Park Elementary School, [D. 313], under the criteria for Students Needing Alternative Programming ("SNAP"), which is a special designation for students in the District who demonstrate low achievement, but who do not otherwise qualify for special education services under the State's criteria for a Specific Learning Disability. [T. 58-59].

       M.M. attended the Jenny Lind Elementary School, which is part of the District, for her fifth grade year, then moved to the Franklin Middle School during the 2002-03 school year.  [D. 707].  From 1996, until approximately February of 2003, M.M. lived with her grandmother, while her mother served a term of imprisonment.  [D. 705]. M.M. has lived with her mother, grandmother, or both, since February of 2003.  [D. 705].

M.M.'s serious trouble in school began in the sixth grade at Franklin Middle School, when teachers discovered that she had brought a four and one-half (4½) inch serrated steak knife to school. [D. 651]. M.M. reported that she had brought the knife to school in order to protect herself from two other girls who had threatened her. [D. 651]. M.M.'s Individualized Education Program ("IEP") team determined that the incident was not a manifestation of M.M.'s disabilities, and they recommended that she be expelled from school. [D. 652]. The District suspended M.M. for the day, but did not expel her. The District agreed with M.M.'s grandmother that M.M. would be reinstated, but that she would not return to Franklin Middle School. Instead, the District agreed to provide M.M. with homebound instruction for the remainder of the 2002-03 school year, and that M.M. would be transferred to a school, other than Franklin Middle School, or Jordan Park Elementary School, in the Fall. [D. 652].

In the Fall of 2003, M.M. was transferred to the Lucy Laney Community School. At L.R.'s request, the District re-evaluated M.M.'s eligibility for special education services, and determined that M.M. qualified for special education services under the criteria for an Emotional Behavior Disorder, as her primary disability; that she continued to satisfy the criteria for SNAP eligibility; and that she also had a Speech Language disability. [D. 319-20]. As a result, on November 19, 2003, the District developed a new IEP for M.M., which included academic, communication, and behavioral goals. [D. 297-304]. The District also developed a Behavior Intervention Plan ("BIP"), in order to address M.M.'s disruptive actions. [D. 323].

On February 13, 2004, M.M. was involved in a fight with another student. When a staff member attempted to intervene, M.M. kicked him and punched him in the face.  [D. 666].  The ALJ concluded that M.M. was suspended "for several days," as a result of the assault, and the supporting documents appear to reflect that M.M. was suspended from approximately February 13, 2004, until March 2, 2004, for a total of ten (10) school days.  [D. 666, 292].[2]  On February 24, 2004, M.M.'s IEP team determined that Lucy Laney was not an appropriate setting for M.M., and they recommended that she be transferred to a different school.  [D. 292].  As a result, M.M. was administratively transferred to Olson Middle School on March 15, 2004, where she completed the 2003-04 school year.   In making that recommendation, the IEP team did not specify why the Lucy Laney Community School was not an appropriate setting, or why the Olson Middle School would provide a better environment for M.M.  [D. 292].

It appears that M.M. made some progress both academically, and behaviorally, during the final part of the 2003-04 school year, but that her behavioral progress was

_____

[2]The ALJ noted that the Record did not allow for a precise determination of the total number of days that M.M. was suspended, during her enrollment at Lucy Laney. However, the ALJ went on to find that "it appears likely that she had been suspended for at least ten days before the incident on February 13, 2004, because at that time the district held an IEP meeting to make a manifest determination."  Affidavit of Margaret O'Sullivan Kane ("Kane Aff."), Exh. 1., at p. 5, ¶13.  The ALJ further noted that "[o]ther records suggest that it is the district's policy to hold such meetings concerning disabled students when the total number of suspension days in a school exceeds ten."  Id.

insufficient to satisfy the goals that had been established in her IEP. [D. 306]. However, the Progress Report, which is dated June 1, 2004, also reflects that absences due to suspensions had interfered with M.M.'s learning. [D. 306]. No records of suspensions were made a part of the Record for the time periods between March of 2004, and the end of the 2003-04 school year, although it appears that M.M. was suspended for approximately six (6) days during that time period.[3]

As noted, M.M. started the 2004-2005 school year at Colonel Charles Young Military Academy, which is a charter school that was selected by L.R. [T. 306-307]. M.M. left the charter school after approximately three weeks, and re-enrolled in the District, at Olson Middle School. [D. 50, 707]. Immediately upon her re-enrollment, M.M.'s IEP team met to discuss potential revisions to the IEP and, on October 7, 2004, the District proposed a revision of M.M.'s IEP that would decrease the amount of time that M.M. would spend with non-disabled peers, and would increase the service minutes that M.M. would receive towards the accomplishment of her reading, writing, and behavioral goals. [D. 281-282]. Specifically, under the revised IEP, M.M.

---

[3]A Functional Behavioral Assessment ("FBA") was completed for M.M. on December 13, 2004. [D. 227-30]. According to the FBA, M.M. had twelve (12) days of out-of-school suspension, and one (1) day of in-school suspension, on record at Olson Middle School. [D. 227]. Other records suggest that, prior to that date, M.M. had received six (6) days of out-of-school suspension, and one (1) day of in-school suspension during the 2004-05 school year. [D. 708, Student's Exhibit ("S."), 199, 211]. As such, it is a fair inference that M.M. was suspended for a total of six (6) days between March 15, 2004, and the end of the 2003-04 school year, following her transfer from Lucy Laney Community School to Olson Middle School.

would receive thirty (30) minutes of special education services for speech and language pathology, two (2) times per week; thirty (30) minutes of services for behavior management, five (5) times per week; fifty (50) minutes of services for math, five (5) times per week; thirty-five (35) minutes of services for reading, five (5) times per week; and fifteen (15) minutes of services for writing, five (5) times per week. [D. 280]. L.R. did not consent or object to the revision, which became effective on October 21, 2004. [D. 283].[4]

On October 11, 2004, the School District sent L.R. a Notice of a Team Meeting, which advised L.R. and M.M. that a meeting would be commenced on October 18, 2004, for the purposes of reviewing M.M.'s IEP, and to develop a secondary transition plan, as well as to discuss the development of a behavioral assessment. [D. 275]. L.R. did not attend this meeting, which resulted in the development of a proposed IEP. [D. 241-246]. In addition to several specific educational and behavior goals, the proposed IEP suggested that M.M. be provided with extended time to complete assignments that required extensive reading and

---

[4]The Record reflects notice of the proposed changes was sent to L.R. on or about October 7, 2004, [D. 277], and that the IEP became effective seventeen (17) calendar days after the notice was sent to L.R. [T. 46-47, D. 283]. However, both the Record, and the findings of the ALJ, reflect that the IEP became effective on October 21, 2004, Kane Aff., Att. A, p. 6, at ¶19, [D. 283], which is only fourteen (14) calendar days after the notice was sent. This discrepancy has no bearing on our analysis, and will not be addressed further.

writing; that M.M. be required to carry a behavior monitoring sheet; and that M.M. be expected to follow the Minneapolis Public School behavior policy. [D. 245].

As noted by the ALJ, it is unclear from the Record, whether this proposed IEP was ever sent to L.R., or whether it ever became effective.[5]  However, a progress report, which was created on November 5, 2004, identifies October 18, 2004, as the date of the IEP, which tends to suggest that the IEP did become effective. [D. 238]. The Progress Report also reflects that M.M. was making adequate progress on her speech goals at that time. [D. 238].  The District also notes that L.R. made a request for M.M. to repeat the seventh grade and, as a result, M.M. was placed in a combined sixth/seventh grade setting, in order to avoid placing her with some seventh grade students with whom she had negatively interacted in the past. [D. 50].

On October 18, 2004, M.M. received one (1) day of in-school suspension and, on October 26, 2004, M.M. was suspended for three (3) days as a result of disruptive behavior in the "time-out room." [Student's Exhibit ("S.") 199].  M.M. was again suspended for three (3) days on November 19, 2004, for fighting. [D. 708, S. 199, 211].  On November 22, 2004, the IEP team modified M.M.'s educational plan, such that the number of minutes set aside for speech education was reduced to fifteen (15), twice weekly, while M.M. would now be spending between twenty-one (21) and sixty

---

[5]Notably, while the School District's List of Exhibits contains references to an IEP of October 18, 2004, see, District's Exhibit List/Index, at unnumbered p. 2, Administrative Record, Item No. 59, referencing D. 254-259, 269-274, those Exhibits do not appear to have been made a part of the Administrative Record.

(60) per cent of her time in a special education resource room, as the least restrictive environment for M.M. to receive a FAPE. [D. 138]. The ALJ noted that no notice of the IEP team meeting was sent to L.R., but that the Record reflects that L.R. was present at the meeting. [D. 133]. Apparently, L.R. did not object to the proposed IEP, nor were any objections noted by the remainder of the IEP team. [T. 78]. On November 30, 2004, the District conducted a transition evaluation of M.M., in order to facilitate M.M.'s transition from school to work, and to assess her post secondary needs. [D. 233].

On December 10, 2004, the District created a Progress Report for M.M. According to the Report, M.M. had made slight progress on her math and reading goals, and moderate progress in her writing goals. The Report reflects that M.M.'s speech goals were "not introduced," and that she was "working on" her behavioral and organizational goals. [D. 249-253].

The District completed a modified BIP, on December 10, 2004, in order to address concerns about M.M.'s difficulties in interacting with her peers; her failure to complete her school work; her failure to comply with staff directives; her fighting; and incidents in which she had been sexually inappropriate with boys. The BIP reflected that M.M. was receiving poor grades in all of her classes because she did not regularly complete her assignments; that she was noncompliant, and verbally disrespectful, to staff on at least three (3) occasions per week; and that she had received at least seven (7) days of suspension during the school year for disruptive behavior, uncooperative

- 10 -

behavior, and fighting.   [D. 231].   The BIP called for M.M.'s assignments to be adapted to her instructional level; that she be paired with a partner or receive extended time to meet deadlines; and that she be placed in a location where she would not be distracted by other students, or noise in the hallway.   The BIP also required that M.M. receive daily direct instruction concerning appropriate interaction with peers and adults, and that she be reminded of work that she had been asked to complete by teachers, as well as to check with her teachers for missing work.   [D. 231].   M.M. was required to carry a point sheet every day, which would provide an assessment of her hourly performance.   According to the BIP, M.M. would be required to bring the point sheet home with her on a daily basis, and L.R. would determine the appropriate reward or consequences for M.M.'s behavior.   At school, M.M. was to receive praise or feedback each hour based on her performance.

The BIP also set forth the proper staff response to future instances of M.M. becoming verbally disrespectful or noncompliant with staff directives.   Initially, staff were directed to employ nonverbal redirection, verbal redirection, and proximity, to get M.M. back on task.   If M.M. continued to be disrespectful or noncompliant, the BIP called for her to be placed in a designated time out area -- other than the hallway -- until she was ready to cooperate with staff.   In the event that M.M. persisted in her noncompliance, she would be removed from the classroom to a Behavior Support Room.

If she did not comply with the staff in the Behavior Support Room, administration would determine the appropriate consequences. If she complied, administration would determine the appropriate action prior to her readmittance into the classroom. If M.M. still continued to be disrespectful or noncompliant with staff direction, she would be placed in "in school" or "out of school" suspension. The BIP also clarified that M.M. was not exempt from the Minneapolis Public School Discipline Policy. [D. 232].

A Functional Behavioral Assessment ("FBA") was completed on December 13, 2004, because the District had imposed twelve (12) days of out-of-school suspension, and one (1) day of in-school suspension, during her enrollment at Olson Middle School, and because an FBA is required when a student has over ten (10) days of suspension on record. [D. 227]. The FBA addressed concerns that M.M.'s disruptive behaviors had increased throughout the course of the 2004-05 school year. [D. 228]. In pertinent part, the FBA recommended that M.M. receive more intensive behavioral support in a smaller, structured classroom environment. [D. 230].

On December 14, 2005, M.M. was suspended for two (2) days for disruptive behavior. [D. 708-709, S. 211]. M.M. was suspended again, on January 4, 2005, for five (5) days, after she struck a physically handicapped student in the face. [D. 215, 224-225]. A manifest determination meeting was conducted on the following day, at which the IEP team determined that the suspension was a manifestation of M.M.'s disability. Recognizing that M.M.'s disruptive behaviors had increased, despite

- 12 -

significant intervention efforts, the IEP team agreed that Olson Middle School was not an appropriate placement for M.M.  [D. 224-225].  The IEP team recommended that M.M. be placed in a Federal Setting III SPAN program.[6]  L.R. initially agreed that SPAN would be a good placement for M.M., [D. 224], and the District advised that it would provide five (5) hours of homebound instruction while awaiting the SPAN placement.  [D. 199].  However, as noted by the ALJ, no homebound instruction was provided during that time period.  [T. 127].

On January 18, 2005, an IEP meeting was conducted, in which the District proposed that M.M. be placed in the Setting III Program at Jordan Park Middle School, and that M.M. would be expected to follow citywide disciplinary policies, Jordan Park expectations, and SPAN expectations, but that the length of suspensions could be modified.  [D. 180].  L.R. refused to consent to the placement.  [D. 174]. L.R.'s objection to the placement was predicated on the high ratio of male to female students in the program, and M.M.'s history of sexually inappropriate behaviors. Instead, L.R. expressed her desire to look at the Setting III program at the Barton Open School, which is a predominantly girls program.  [D. 194].  However, at that time there were no openings at the Barton Open School program.  [T. 455-57].

At the Hearing, Bill Smart ("Smart"), who is a social worker at Olson Middle School, and who was a member of M.M.'s IEP team there, testified that he concurred

---

[6]"SPAN" is an acronym for a Federal Setting III program.  [T. 518].

with L.R.'s assessment that, given M.M.'s history of sexually inappropriate behavior towards boys, the high ratio of boys to girls at the Jordan Park program rendered that program inappropriate for M.M. [T. 457]. Similarly, Don Allen ("Allen"), who is one of the Assistant Directors of Special Education for the District, [T. 513], agreed with the ALJ's assessment that the District had proposed a Setting III placement for M.M. in January of 2005, and had arranged for L.R. to visit the Jordan Park program, but that, after the visit, "everyone agreed that [the Jordan Park] program was not appropriate for [M.M.] because she had been sexually inappropriate in the past with boys." [T. 556].

M.M. returned to school on or about January 19, 2005, [T. 350], and within days she was suspended for three (3) days for fighting. [S. 211]. The IEP team determined that this behavior was a manifestation of M.M.'s disability, and decided that homebound services would begin as soon as a teacher could be located. [D. 193]. M.M. was suspended, again, on February 1, 2005, for four (4) days, after she had brought a can of mace to school, and again, on February 15, for four (4) days, after she assaulted another student. [S. 199, 211]. On February 16, the District sent L.R. a notice of the District's proposed action, which sought permission from L.R. to implement the IEP of January 18, 2005, which, in turn, called for M.M. to be placed in the Jordan Park SPAN program. L.R. refused to consent to the proposed action. [D. 173-74].

M.M. was suspended for one (1) to three (3) days on February 28,[7] for disruptive behavior, and again on March 7, for three (3) days, after she threatened to throw a chair at another student, and again on March 17, for three (3) days, for fighting.  [D. 708, S. 199, 211].  Also on March 3, L.R. was present at the school where she witnessed an argument between M.M. and one of her peers.  L.R. responded by saying something to the effect that, "if he [the other student] puts his hands on my daughter I will slap him" and, as a result, the District sent L.R. a "no trespass" notice.  [D. 115].   Another IEP team meeting was conducted on March 9, at which the team, again, proposed that the M.M. be placed in a Setting III SPAN program, and identified Jordan Park as an appropriate setting.  [D. 152].  L.R. did not attend the IEP meeting, and a Notice of the proposed action was sent to L.R.  L.R. objected to the proposed IEP and, pursuant to L.R.'s request, a mediation took place on March 28, 2005.  L.R. testified that she sought mediation because she wanted M.M. to be transferred out of Olson, and because she was concerned that M.M. was not receiving all of the services that she needed for the time periods when she was suspended.  [T. 341-342].

At the mediation, the District had agreed that it would try to get M.M. into the SPAN program at Barton Open.  [T. 336-337].  However, after visiting with a teacher

---

[7]S. 199 reflects that M.M. was suspended for two (2) days on February 28, 2005, while S. 211 suggests that the February 28 suspension lasted three (3) days, and D. 709 provides that M.M. was only suspended for one (1) day on February 28.

from the Barton Open program, L.R. concluded that the program focused too heavily on behavior, as opposed to academics, and that such a placement would be inappropriate for M.M. [T. 338]. In any event, the ALJ noted that it is not clear whether there was ever an opening at Barton Open, or whether the option was ever presented to L.R. prior to M.M.'s Due Process Complaint.[8]

The mediation agreement also contained some discussion of compensatory education minutes to make up for services that had not been provided during the 2004-05 school year. Apparently, the District subsequently agreed to provide M.M. with a total of 390 minutes in compensatory benefits. [D. 1]. Smart testified that he was under the impression that L.R. had agreed to the 390 minutes, based on his belief that a conversation between Barbara Muir ("Muir"), who is the Principal at Olson Middle School, and L.R. had occurred, but that he was not a part of that conversation. [T. 484]. However, L.R. testified that she did not agree with the District's calculation of compensatory minutes. [T. 363-367]. Subsequently, Smart provided M.M. with a total of sixty (60) minutes of services on April 12, and April 14, 2005. [D. 1-4]. Apparently, the District had scheduled other times for Smart to complete the

---

[8]As part of its Offer of Settlement dated July 29, 2005, the District offered to place M.M. in the Barton Open Setting III Program. See, Kane Aff., at Exh. 5. Also, in a letter from counsel for the District to counsel for the Plaintiff, the District reiterated its offer to place M.M. in the Barton Open program. See, Letter of August 8, 2006, from Laura Tubbs Booth to Margaret O'Sullivan Kane, at unnumbered p. 1, Administrative Record, at Item No. 12.

compensatory minutes, but that, during those times, M.M. had either refused to cooperate, was suspended, or was otherwise absent from school.  [D. 4].

Pursuant to the mediation agreement, M.M. was enrolled in the W. Harry  Davis Academy, on April 11, 2005.  [D. 707].  M.M.'s IEP team also met that day, in order to discuss M.M.'s transition from Olson Middle School, and potential changes to M.M.'s IEP, and to schedule an updated FBA for April 28, 2005.  [D. 144].  On April 18, 2005,  M.M. was suspended for her involvement in a fight in which M.M. used mace on another student.  The mace was apparently provided to M.M. by her aunt. [D. 7-14, T. 436].  On April 25, 2005, the IEP team conducted a meeting, in which they determined that the fight was a manifestation of M.M.'s disability.  [D. 15].  On April 26, 2005, a proposed IEP was delivered to L.R., which called for a homebound placement with approximately fifteen (15) hours of service per week for the duration of the 2004-05 school year.  [D. 637-642].  However, L.R. did not agree to the proposed IEP because, in her view, it did not provide enough services.  [T. 429-432]. While the  District sent schoolwork for M.M. to complete at home, no homebound instruction was provided during the period of suspension.  [T. 196].

On May 2, 2005, L.R. notified Jennifer L. Crouch, who is the Social Worker at the W. Harry Davis Academy, that she would not agree with the proposed IEP and, on May 3,  M.M. was allowed to return to school.  However, given M.M.'s history of fighting, she was advised that she would be subjected to a daily search, in order to ensure that she did not have any weapons in her possession.  [D. 630].   After

- 17 -

observing the search, L.R. took M.M. home, and kept her there until May 10, 2005, because she did not want M.M. to be subjected to the daily search. [T. 377]. The District subsequently sent L.R. a truancy letter, which advised L.R. that M.M. was required to attend school, and M.M. returned to school on May 11, 2005. Upon her return, M.M. continued to be searched each morning. M.M. cooperated with the procedure, and no weapons were discovered during the daily searches.

At some point near the end of the 2004-05 school year, M.M. was the victim of a sexual assault outside of the school. [D. 705]. As a result, she missed several days of school. [D. 708].

On May 16, 2005, the Plaintiff filed a Complaint and Request for Due Process Hearing, in which she asserted that the District had failed to provide her with a FAPE by excluding her from the public education setting through suspensions, exclusions, and administrative transfers within the District. Kane Aff., at Exh. 2. The Plaintiff also asserted that the District was failing to address M.M.'s behaviors with an appropriate BIP, and that the District had failed to provide specific services to address M.M.'s learning disabilities. The District generally denied the allegations in the Plaintiff's Complaint, and requested a Hearing on the issue of whether a Setting III placement was appropriate for M.M. Letter of May 18, 2005, from Laura Tubbs Booth to Kathleen Sheehy, Administrative Record, at Item No. 45.

As part of her Notice of Request for a Hearing, the Plaintiff sought the conduct of a comprehensive Independent Educational Evaluation ("IEE") at the District's

expense. The parties subsequently agreed to an IEE, such that Dr. Cindy Spicuzza, who is a pediatric neuropsychologist, would be retained to review M.M.'s student records, and further agreed that, if Dr. Spicuzza recommended further testing, the District would cover the expense of such testing. Id., at Exh. 3. Subsequently, upon the recommendation of Dr. Spicuzza, a FBA was conducted by Janice Ostrom ("Ostrom"), who is a licensed psychologist, and a Board Certified Behavior Analyst.

Following her evaluation, Dr. Spicuzza determined that M.M. had normal verbal reasoning abilities, good verbal learning and memory skills, good verbal fluency, good simple mental flexibility, and normal deductive reasoning. However, Dr. Spicuzza also noted significant cognitive limitations and behavioral history, and she diagnosed M.M. with a mild conduct disorder, attention deficit/hyperactivity disorder of the inattentive type, and mood disorder, not otherwise specified. Dr. Spicuzza also opined that M.M.'s disruptive behaviors were unlikely to remit, and probably required a more restrictive setting including, possibly, a day treatment program, to ensure the best educational outcome. [D. 705, at p. 7-8].

Dr. Spicuzza also provided a number of other recommendations, including the avoidance of programs that rely heavily on penalties, demand critical self-analysis, or require earning points; that opportunities for successful social interactions be created by engaging M.M. in adult-supervised, small-group, structured social activities; that M.M. be provided with frequent breaks during academic tasks; that mainstream education be avoided unless behavioral and social control is gained; that M.M.'s

workload be reduced, but that she be challenged academically; that M.M. be provided with individualized help; that tasks be broken down into small and manageable steps; that M.M. be provided with greater organizational support at times of transition; that M.M. be provided with extended time on tests; that tests be conducted in a minimally intrusive environment; that M.M. be provided help with organizational needs, in terms of both assignments and material needs; that prior to testing, M.M. be provided with simple written outlines, pre-test study guides, and key terms or concepts that she should be focusing on; that M.M. be provided with step-by-step instructions on higher order tasks; that note-taking support and consistent keyboard instruction be considered; and that some hands-on activities be offered to enhance attention and active engagement.

On August 2, 2005, Ostrom issued a Report following her FBA of M.M.  [S. 213].  In her Report, Ostrom recognized that M.M. is an extremely social child, and that strategies which provide attention to positive behavior, while ignoring inappropriate or problematic behavior, should be employed.  Ostrom recommended that M.M. be placed in a highly restrictive environment, and that it would be appropriate for the IEP team to consider a more restrictive Federal Setting.  Ostrom also recommended that strategies be employed to enhance M.M.'s participation, by maintaining brief periods of high level structure consisting of direct, or hands-on participation, and modification of instructional materials to correspond to M.M.'s academic level; that an adult mentor be utilized to help M.M. process social situations;

and that strategies be developed to prompt M.M. to separate herself from difficult social situations. [S. 213].

On August 5, 2005, M.M.'s IEP team met to discuss placement options for M.M. Also present at the meeting were counsel for the Plaintiff, Dr. Spicuzza, and Ostrom. The meeting included presentations on the Barton Open program, as well as two programs from outside of the District, one of which was identified as the STRIVE program. [D. 733]. No agreement was reached during that meeting as to an appropriate placement for M.M.

On September 1, 2005, the ALJ issued Findings of Fact, Conclusion, and Decision, in which she concluded that the District had failed to satisfy the requirements of the IDEA in several different respects. See, Affidavit of Margaret O'Sullivan Kane ("Kane Aff."), at Exh. 1. Specifically, the ALJ found that M.M.'s repeated suspensions, during the 2004-05 school year, constituted a change in placement without parental consent, id. at p. 19, ¶11; that the District had failed to review and revise M.M.'s IEP in March of 2004, when M.M. was transferred from Lucy Laney to Olson Middle School, and between January and April of 2005, id., at p. 20, ¶17; and that the District failed to provide L.R. with written notice before eliminating the student's speech services. Id., at p. 21, ¶23. Additionally, the ALJ made the following finding:

> The district has proved by a preponderance of the evidence
> that the student requires placement in a Setting III program;
> however, the IEP proposed by the district on March 9,

2004,[9] does not provide the student with FAPE because it calls for placement in a specific program that the IEP team had already determined was not appropriate for the student and because it requires that the student will continue to be subject to the discipline policies that resulted in an improper change of placement.   To this extent the IEP is not reasonably calculated to achieve educational benefit.

Id. at p.21, ¶28.

The ALJ also concluded that the District's denial of FAPE to M.M. resulted in a loss of educational benefit to M.M., and that compensatory educational services were required so as to address the loss of educational benefit.  Id. at p.22, ¶33.

In other respects, the ALJ determined that the District had complied with the requirements of the IDEA.  Specifically, the ALJ found that the District conducted appropriate re-evaluations of M.M., in November of 2003, and December of 2004, id. at p. 20, ¶15; that the District appropriately considered L.R.'s input in conducting its re-evaluations of M.M., id. at p. 20, ¶19; that the District obtained informed parental consent, or took reasonable measures to obtain such consent before conducting re-evaluations of M.M., id. at p. 21, ¶21; that the District had an IEP in place at the beginning of each school year, id. at p. 21, ¶25; that, in recommending a Setting III placement, the District did not fail to provide M.M. with necessary supplementary aids and services in the least restrictive environment, id. at p. 21, ¶27; and that the classrooms and facilities provided by the District established an environment that was

---

[9]It appears that the IEP, which is being referenced by the ALJ, actually was issued on March 9, 2005, as opposed to March 9, 2004.

conducive to learning.  Id. at p. 22, ¶31.  The ALJ also concluded that, as of the date of the decision, the Setting III program at Barton Open School was the least restrictive environment for M.M.  Id. at p. 21, ¶29.

Based upon her findings, the ALJ instructed the District to convene M.M.'s IEP team as soon as possible, in order to develop an IEP that was based upon M.M.'s current levels of performance; to retain Ostrom to consult with the IEP team to revise the student's BIP, in order to allow for revisions of the District's city-wide disciplinary policy; to place M.M. at the SPAN program at Barton Open School, in the absence of an alternative agreement between the parties; and to provide M.M. with compensatory educational services in the amount of twenty (20) hours for the 2003-2004 school year, 168 hours for the 2004-2005 school year, and an additional 330 minutes of compensatory education services pursuant to the mediation agreement.  Id. at pp. 22-23.

As noted, the District has appealed the ALJ's decision in all respects, except as to the placement of M.M. in the Barton Open program, and specifically, the ALJ's award of compensatory benefits for the 2003-04, and 2004-05 school years, while the Plaintiff's seek an award of costs and attorney's fees, as the "prevailing party" in the underlying action.  Since our determination of the District's appeal has potential implications on the Plaintiff's entitlement to an award of costs and attorneys fees, we will address the District's Motion for Summary Judgment first, before proceeding to the Plaintiff's request for costs and attorney's fees.

- 23 -

III.   <u>Discussion</u>

A.     <u>The District's Motion for Summary Judgment</u>.

1.     <u>Standard of Review</u>.   "Under the IDEA, a party may appeal from the state administrative proceedings to a federal district court."   <u>School Board of Independent School District No. 11 v. Renollett</u>, 440 F.3d 1007, 1010 (8th Cir. 2006), citing <u>Title 20 U.S.C. §1415(i)(2)</u>.   Under this form of review, "[t]he district court must review the state administrative record, hear additional evidence, if requested, and grant such relief it deems appropriate, basing its decision on the preponderance of the evidence."   <u>Id.</u> "Judicial review of agency action may be conducted on the administrative record even if there are disputed issues of material fact."   <u>Independent School District No. 283 v. S.D.</u>, 88 F.3d 556, 561 (8th Cir. 1996).

Although this is "a less deferential standard of review than the substantial evidence test common to federal administrative law[,] * * * it still requires the reviewing court to give 'due weight' to agency decision-making."   <u>Id.</u>; see, <u>Blackmon ex. rel Blackmon v. Springfield R-XII School District</u>, 198 F.3d 648, 654 (8th Cir. 1999);   see also, <u>Bradley ex rel. Bradley v. Arkansas Dept. of Education</u>, 443 F.3d 965, 974 (8th Cir. 2006).   "The district court must give 'due weight' because the [ALJ] had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review."   <u>CJN v. Minneapolis Public Schools</u>, 323 F.3d 630, 636 (8th Cir. 2003); see, <u>Stringer v. St. James R-1 School District</u>,446 F.3d 799, 803 (8th Cir. 2006);

Bradley ex. rel Bradley v. Arkansas Dept. of Education, supra at 974. "Judicial review of the [ALJ's] decision under the IDEA is limited because judges are not trained educators." Nygren v. Minneapolis Public Schools, 2001 WL 1690048 at *3 (D. Minn., December 14, 2001).

2. Legal Analysis. The District's Motion for Summary Judgment seeks a reversal of the decision of the ALJ, to the extent that the ALJ determined that she had jurisdiction over claims which pre-dated M.M.'s temporary transfer outside of the District in September of 2004, as well as the ALJ's award of compensatory educational benefits. In so urging, the District identifies several different errors in the ALJ's determination including: 1) the ALJ's assignment of the burden of proof at the Administrative Hearing; 2) the ALJ's determination that M.M.'s enrollment at the Colonel Charles Young Military Academy, for a three-week time period, did not preclude compensatory educational benefits for time periods that preceded the transfer; 3) the ALJ's determination that the mediation agreement did not preclude an award of compensatory educational benefits for the 2004-05 school year; and 4) the ALJ's determination that the District denied M.M. a FAPE, and the resultant award of compensatory education benefits. The District also contends that a Default Judgment against the Plaintiff is appropriate as to the District's Counterclaim. We address each of these contentions, in turn.

a. Default Judgment. The District contends that a Default Judgment must be entered against the Plaintiff since the Plaintiff failed to Answer its

Counterclaim until January 26, 2006, which was approximately eighteen (18) days after the time period allowed under the Federal Rules of Civil Procedure.[10]  "When a party 'has failed to plead or defend' against a pleading listed in Rule 7(a), entry of default under Rule 55(a) must precede grant of default judgment under Rule 55(b)."  Johnson v. Allied Interstate, Inc., 2002 WL 1906024, at *2 (D. Minn., August 19, 2002), quoting Johnson v. Dayton Electric Manufacturing Co., 140 F.3d 781, 783 (8th Cir. 1998).  Thus, as an initial matter, the District's failure to obtain an entry of default, under Rule 55(a), as to its Counterclaim, combined with the fact that the Plaintiff has now filed responsive pleadings, weighs against the District's request for a Default Judgment.  See, Johnson v. Allied Interstate, Inc., supra at *2.

Furthermore, even if we overlook the District's failure to obtain an entry of default, a Default Judgment, under the circumstances presented here, would be improper.  Notably, Rule 55(c) allows the Court to set aside an entry of default "for good cause shown," or "in accordance with Rule 60(b)," which in turn provides that a Judgment may be set aside upon a showing of "mistake, inadvertence, surprise, or

---

[10]Our review of the file discloses that the District filed its Answer and Counterclaim on December 18, 2005, and an Amended Answer and Counterclaim on December 29, 2005.  Rule 12(a)(2), Federal Rules of Civil Procedure, requires that a Reply to a Counterclaim be served within twenty (20) days after service of the Answer and Counterclaim, and, where an Amended Answer and Counterclaim is filed, Rule 15(a), Federal Rules of Civil Procedure, provides that "[a] party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be longer."  Applying those Rules here, the Plaintiff's Reply to the District's Counterclaim should have been served by no later than January 8, 2006.

excusable neglect." "[W]hether conduct is excusable is an equitable determination that 'tak[es] account of all relevant circumstances surrounding the party's omission.'" Johnson v. Dayton Electric Manufacturing Co., supra at 784, citing Pioneer Investment Services v. Brunswick Associates Limited Partnership, 507 U.S. 380, 395 (1993).

Guided by Johnson v. Dayton Electric Manufacturing Co., the following factors are of principal consideration: 1) "the blameworthiness of the defaulting party;" 2) whether the defaulting party has presented a meritorious defense; and 3) prejudice to the non-defaulting party. Id. at 784-785. "[P]rejudice may not be found from delay alone or from the fact that the defaulting party will be permitted to defend on the merits." Id. at 785. Instead, the asserted prejudice must be "concrete," such as "loss of evidence, increased difficulty in discovery, or greater opportunities for fraud and collusion." Id., quoting Berthelson v. Kane, 907 F.2d 617, 621 (6th Cir. 1990). Such considerations reflect the "judicial preference for adjudication on the merits." Id. at 784, citing Oberstar v. F.D.I.C., 987 F.2d 494, 504 (8th Cir. 1993).

Considering the factors identified in Dayton Electric, the District has failed to demonstrate that a Default Judgment against the Plaintiff, on the District's Counterclaim, would be proper. Specifically, the District has not demonstrated that the Plaintiff's failure to file a timely responsive pleading was a gesture of bad faith, or was otherwise intended to delay the proceedings, see, Forsyth v. Hales, 255 F.3d 487, 490 (8th Cir. 2001)(while "[d]efault judgment is appropriate where the party against whom the judgment is sought has engaged in willful violations of court rules,

contumacious conduct, or intentional delays * * * [it] is not an appropriate sanction for a marginal failure to comply with time requirements."), and, in any event, the District has not identified any prejudice that has resulted from the Plaintiff's untimely response.  See, Johnson v. Allied Interstate, Inc., supra at *2 (responsive pleading that was filed sixty-four (64) days after deadline did not warrant a default judgment, in the absence of concrete prejudice).  Therefore, we recommend that the District's request that Default Judgment be entered against the Plaintiff, on its Counterclaim, be denied.

 b. The Burden of Proof.  Under Minnesota law, "[t]he burden of proof at a due process hearing is on the district to demonstrate, by a preponderance of the evidence, that it is complying with the law and offered or provided a free appropriate public education to the child in the least restrictive environment."  See, Minnesota Statutes Section 125A.091, Subdivision 16.  Relying on this provision, the ALJ placed the burden of proof on the District to demonstrate that it had provided M.M. with a FAPE, in the least restrictive environment.  The District now asserts that Section 125A.091, Subdivision 16, has been preempted by the IDEA, as the IDEA was interpreted in the recent decision of the United States Supreme Court, in Schaffer v. Weast, --- U.S. ---, 126 S.Ct. 528 (November 14, 2005), and, as a result, the ALJ's assignment of the burden of proof was improper.

The issue before the Court, in Schaffer, was whether the IDEA placed the burden of proof, at an Administrative Hearing, on the school district.  The Court answered this question in the negative, holding that "[t]he burden of proof in an

- 28 -

administrative hearing challenging an IEP is properly placed on the party seeking relief." Id. at 537.  In so holding, the Court noted that the IDEA was silent concerning the burden of proof at Administrative Hearings, and that, under the "default rule," the burden of persuasion typically falls upon the party seeking relief.  Id. at 535, 537.

The Court also noted that several States, including Minnesota, have laws or regulations which place the burden of proof at the administrative hearing on the school district.  However, the Court explicitly declined to address the issue that is presently before us:  whether "States may * * * override the default rule and put the burden always on the school district," since the defending school district in that action was located in the State of Maryland, which did not have a statute or regulation that imposed such a burden on a school district.  Id. at 537.

"Placing the burden of proof on the incorrect party is reversible error."  West Platte R-II School District v. Wilson, 439 F.3d 782, 785 (8th Cir. 2006).  Prior to Schaffer, the law in this District, and Circuit, provided that, "[a]t the administrative level, the District clearly ha[s] the burden of proving that it had complied with the IDEA," E.S. v. Independent School District, No. 196, 135 F.3d 566, 569 (8th Cir. 1998); see, Pachl ex rel. Pachl v. Seagren, 2005 WL 1140618 at *4 (D. Minn., May 11, 2005).  However,  relying on Schaffer, our Court of Appeals has recently determined that the burden of proof at an administrative hearing was improperly placed on a school district.  See, West Platte R-II School District v. Wilson, supra at 785; School Board of Independent School District No. 11 v. Renollett, supra at 1011, n. 3.

The circumstances before the Court in West Platte are clearly distinguishable from those which are presented here. Specifically, the Court, in West Platte, was operating under the IDEA framework that had been established by Missouri law, as opposed to Minnesota law. Unlike Minnesota, Missouri does not appear to have any statute or regulation that allocates the burden of proof in a Due Process Administrative proceeding and, as a result, the Schaffer holding directly applicable. Here, however, the question raised is precisely the one that the Court in Schaffer refused to decide; namely, whether "States may * * * override the default rule and put the burden always on the school district."

However, as is the case here, the Court, in School Board of Independent School District No. 11 v. Renollett, supra, was operating under the IDEA framework adopted by the State of Minnesota and, while the allocation of the burden of proof was immaterial to the outcome of the case before it, the Court made the following observation:

> In Schaffer ex rel. Schaffer v. Weast, the Supreme Court held that the burden of persuasion in an administrative hearing challenging an IEP is properly placed upon the party seeking relief, whether that is the disabled child or the school district. --- U.S. ----, ----, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005). At the time of the administrative proceedings in this case, however, the law in our Circuit placed the burden on the school district. E.g.,Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir.1999); E.S. v. Indep. Sch. Dist., No. 196, 135 F.3d 566, 569 (8th Cir.1998). Here, [the student] sought relief, and the burden of persuasion was placed on the District. In light of Schaffer, it was error to place the

> burden on the District, but the error was harmless because
> the District prevailed.

Id. at 1011, n. 3.

In making this observation, the Court did not reference the statutory allocation of the burden of proof set forth in Minnesota Statutes Section 125A.091, Subdivision 16, and it is unclear whether the Court was ever made aware of that statutory provision through the arguments of counsel, or through its own independent research. Moreover, the Court did not address the express decision of the Court, in Schaffer, not to consider circumstances, such as those which exist in Minnesota, where the State has chosen to statutorily allocate the burden of proof.

By way of contrast, a Court in this District, in a decision that pre-dated Renollett, determined that the rule in Schaffer was inapplicable under Minnesota law, providing as follows:

> In the proceedings before the ALJ, the burden was placed
> on the District.  (Decision at 10.)  While this appeal was
> pending, the Supreme Court held that the "burden of proof
> in an administrative hearing challenging an IEP is properly
> placed upon the party seeking relief."  Schaffer v. Weast,
> 126 S.Ct. 528, 537 (2005).  However, the Schaffer Court
> declined to address the issue of whether a state could, by
> statute, place the burden of proof exclusively upon the
> school district.  Id.  Minnesota law firmly places the burden
> in such hearings on the school district.  Minn. Stat.
> §125A.091, subd. 16. (2004).  Thus, the Court finds that
> the holding in Schaffer does not apply here, and the ALJ
> correctly placed the burden of proof on the District in
> accordance with Minnesota law.

See, Independent School District No. 701 v. J.T., 2006 WL 517648 at *6, n. 6 (D. Minn., February 28, 2006); see also, Gellert v. District of Columbia Public Schools, --- F. Supp.2d ----, 2006 WL 1363851 at *4, n. 3 (D. D.C., May 18, 2006)(finding that

<u>Schaffer</u> "does not affect the validity of the District of Columbia's regulation placing the burden of proof at the administrative level on [the school district].").

As a Court of inferior jurisdiction, we do not disregard the guidance of our Court of Appeals, even if the guidance is expressed in <u>dicta</u>.  However, given the absence of any discussion concerning the Minnesota statutory framework, or the Supreme Court's express decision not to address a State's authority to statutorily assign the burden of proof, we are unable to attribute to the Court's analysis, in <u>Renollett</u>, an intention to extend the rule in <u>Schaffer</u> to situations where the State has specifically allocated the burden of proof by statute.  Accordingly, the Court's cursory discussion in <u>Renollett</u>, where the allocation of the burden of proof was adjudged to be harmless error, does not bind our analysis, and is not persuasive given the express terms of the Minnesota Statute.

Instead, we conclude that a close reading of <u>Schaffer</u>, in conjunction with existing Supreme Court and Eighth Circuit precedent, does not support the IDEA's preemption of Minnesota law on this point.  "Congress' intention in enacting the IDEA 'was not that the Act displace the primacy of the States in the field of education, but that the States receive funds to assist them in extending their educational systems to the handicapped.'" <u>Little Rock School District v. Mauney</u>, 183 F.3d 816, 830 (8th Cir. 1999), quoting <u>Board of Ed. of Hendrick Hudson Central School Dist v. Rowley</u>, 458 U.S. 176, 208 (1982).  Under this method of "cooperative federalism," States have the authority to "establish and maintain procedures in accordance with this section to

- 32 -

ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." Title 20 U.S.C. §1415(a); see, Schaffer v. Weast, supra at 532 (recognizing that States have the responsibility for establishing fair Hearing procedures); Little Rock School District v. Mauney, supra at 830 ("If a state does choose to participate, authority is vested in state and local bodies to effectuate the legislation's substantive and procedural guarantees.").

Given this framework, so long as the State procedures satisfy the minimum Federal guidelines, they are not preempted by the IDEA. Converse County School District No. Two v. Prat, 993 F. Supp. 848, 855 (D. Wy. 1997), citing Evans v. Evans, 818 F. Supp. 1215, 1223 (N.D. Ill. 1993). As was recognized by the Court in Town of Burlington v. Department of Education of the Commonwealth of Massachusetts, 736 F.2d 773, 784 (1st Cir. 1984), affirmed, sub nom., School Committee of Town of Burlington v. Department of Education of the Commonwealth of Massachusetts, 471 U.S. 359 (1985):

> While compliance with the minimum standards set out by the federal Act is mandatory for the receipt of federal financial assistance * * * the Act does not presume to impose nationally a uniform approach to the education of children with any given disability; it requires only that a "free * * * appropriate education," * * * in conformity with the state's educational standards, * * * be provided to each disabled child upon individualized evaluation and planning. * * * "Cooperative federalism" in this context, then, allows some substantive differentiation among the states in the determination of which educational theories, practices, and

> approaches will be utilized for educating disabled children with a given impairment.  Rowley at 207-08, 102 S.Ct. at 3051-52.

Accordingly, for the purposes of the IDEA "[w]here a state law is more stringent than a federal law the two are consistent and the state law is not subject to federal preemption." Ivan P. v. Westport Board of Education, 865 F. Supp. 74, 79 (D. Conn. 1994), aff'd 101 F.3d 686 (2nd Cir., June 7, 1996); see, Atkowiak v. Ambach, 831 F.2d 635, 641 (2nd Cir. 1988).

The Court, in Schaffer, did not hold that the allocation of the burden of proof on a school district interfered with the substantive guarantees of the IDEA.  Rather, the Court recognized that "Congress has never explicitly stated * * * which party should bear the burden of proof at IDEA hearings," and that, "[a]bsent some reason to believe that Congress intended otherwise * * * we will conclude that the burden of persuasion lies where it usually falls, on the party seeking relief." Schaffer v. Weast, supra at 534-35.  As such, in the absence of some evidence that Congress intended to impose the "default rule" onto the States which have assigned the burden of proof differently, we decline to read Schaffer in such a manner as would limit the State's authority to establish more stringent procedures for effectuating the substantive guarantees of the IDEA.

Therefore, since Minnesota law specifically places the burden at an administrative hearing on the school district, we find that the ALJ's allocation of the burden of proof was proper.

       c.    <u>The ALJ's Jurisdiction to Award Compensatory Benefits for the</u> <u>2003-04 School Year</u>.  The ALJ awarded M.M. twenty (20) hours of compensatory education services for the 2003-04 school year.  The District now challenges that award based on L.R.'s decision to voluntarily enroll M.M. in the Colonel Charles Young Military Academy at the beginning of the 2004-05 school year.  M.M. was enrolled in the charter school from September 7, 2004, until September 27, 2004, when she re-enrolled with the District.  The District urges that, since M.M. did not seek a Due Process Hearing prior to her enrollment in a school outside of the District, she waived any IDEA claim for events that preceded her enrollment.  Thus, the District contends that the ALJ erred by awarding M.M. compensatory education benefits for the 2003-2004 school year.

       The District's argument is primarily predicated on the analysis of our Court of Appeals in <u>Thompson ex rel. Buckhanon v. Board of Special School District No. 1</u>, 144 F.3d 574, 579 (8th Cir. 1998).  In <u>Thompson</u>, the plaintiffs filed an IDEA claim against the District.  However, prior to the plaintiffs' request for a Due Process Hearing, the student was removed from the District by his parents, and enrolled in a charter school.  After recognizing that Minnesota law required that a Due Process Hearing "be initiated and conducted by and in the school district responsible for assuring that an appropriate program is provided," <u>id.</u>, quoting <u>Minnesota Statutes</u>

Section 120.17, Subdivision 3(b)(e),[11] the Court held that the transfer was fatal to the

plaintiffs' IDEA claim, reasoning as follows:

> Thompson has not stated a cause of action under IDEA
> because his request for a review comes after he left the
> District previously responsible for his education. At the time
> Thompson brought suit, Minnesota law considered a
> charter school a separate school district.   Minn. Stat.
> §120.064, subd. 12.   IDEA provides a mechanism for
> challenging the education a student has been provided
> within a school district.  If a student changes school
> districts and does not request a due process hearing, his or
> her right to challenge prior educational services is not
> preserved.  Subsequent challenges to the student's previous
> education become moot because the new school district is
> responsible for providing a due process hearing.
>
> *       *       *
>
> Contrary to [the plaintiffs'] assertions, her need to preserve
> the right to challenge [the student's] prior educational
> services is not simply a procedural barrier.  The purpose of

---

[11]In 2003, Minnesota Statutes Section 120.17, Subdivision 3(b)(e), which had
previously been renumbered as Minnesota Statutes Section 125A.09, was repealed.
However, under existing Minnesota law:

> A parent or a district is entitled to an impartial due process
> hearing conducted by the state when a dispute arises over
> the   identification,   evaluation,   educational   placement,
> manifestation determination, interim alternative educational
> placement, or the provision of a free appropriate public
> education to a child with a disability. The hearing must be
> held in the district responsible for ensuring that a free
> appropriate public education is provided according to state
> and federal law. The proceedings must be recorded and
> preserved, at state expense, pending ultimate disposition of
> the action.

Minnesota Statute Section 125A.091, Subdivision 12(a).

> requesting a due process hearing is to challenge an aspect
> of a child's education and to put the school district on
> notice of a perceived problem.  Once the school district
> receives notice, it has the opportunity to address the alleged
> problem.  Under [the plaintiffs'] theory, a school would be
> potentially liable for unanticipated costs for alleged
> problems of which it is totally unaware.

Id. at 578-579.

The principles set forth in Thompson were affirmed in Smith ex rel. Townsend v. Special School District No. 1, 184 F.3d 764, 766-67 (8th Cir. 1998), where the Court held that a student who had moved from the Minneapolis school district to the school district for Bloomington, Minnesota, and who was attending school in the Bloomington school district at the time that the Due Process Hearing was requested, did not have a viable action against the Minneapolis school district under the IDEA.

Similarly, in M.P. v. Independent School District No 721, 326 F.3d 975, 981 (8th Cir. 2003), the Court held that a student who changed his enrollment from the school district for New Prague, Minnesota, to the school district for Northfield, Minnesota, but who continued to reside in the New Prague school district, could not maintain an IDEA action against the New Prague school district, when he had failed to request a Due Process Hearing prior to his enrollment in the Northfield school district.  M.P. v. Independent School District No. 721, supra at 981.

Despite the urging of the District, the ALJ declined to hold that M.M. had waived her claims by temporarily transferring to the Colonel Charles Young Military Academy.  In so holding, the ALJ distinguished Thompson, Smith, and M.P., by

- 37 -

noting that M.M. had moved back into the District after only a short period of enrollment at the charter school, and that she had remained in the District through the time that the Hearing was requested.  In so finding, the ALJ noted that Thompson, Smith, an M.P., "were decided not on the basis that the student waived the right to challenge past services by changing districts without requesting a due process hearing, but only on the statutory basis that the student may only request a due process hearing, and thereby exhaust administrative remedies, from the district that is obligated to provide the student with an appropriate education."  Kane Aff., Exh. 1, at p. 25.

The District disputes the ALJ's characterization of Eighth Circuit precedent, and urges that the facts, in Smith, are directly analogous.  Specifically, the District notes that, in Smith, the Court declined to address the merits of the plaintiff's IDEA claim despite the fact that the student had moved back into the District.  Smith ex rel. Townsend v. Special School District No. 1, supra at 768.  While that observation is true, the District's reading of Smith is overly broad.  In Smith, counsel for the plaintiff advised the Court, without supplementing the record on appeal, that the student had moved back to the Minneapolis District, but that he continued to attend school in Bloomington.  The Court assumed the plaintiff's representation to be true, but nonetheless, upheld the dismissal of the IDEA claim upon the observation that "[the student] may now seek relief against Special School District No. 1 based on current conditions, but this is an entirely different claim from that for which [the student]

exhausted his administrative remedies and which he presented to the district court." Id. at 768.

In contrast to Smith, the Plaintiff's request for a Due Process Hearing, here, was made at a time when M.M. was attending school in the District, and when the District was responsible for providing M.M. with a Due Process Hearing.  See, Minnesota Statutes Section 125A.091, Subdivision 12(a).  Furthermore, unlike the circumstances in Smith, all of the Plaintiff's claims against the District, including those which pre-date the transfer, were administratively exhausted in the proceedings before the ALJ.

In all three cases relied upon by the District, the school district that was responsible for providing the student with a Due Process Hearing, at the time that the Hearing was requested, was different from the school district that was alleged to have deprived the respective students of their FAPE rights.  In each of those cases, the Court made note of this fact, which appears to have provided the bases for those decisions.   See, M.P. v. Independent School District No 271, supra at 980 ("Subsequent challenges to the student's previous education become moot because the new school district is responsible for providing a due process hearing."), quoting, Thompson ex rel. Buckhanon v. Board of Special School District No. 1, supra 579; Smith ex rel. Townsend v. Special School District No. 1, supra at 767 (same), quoting Thompson ex rel. Buckhanon v. Board of Special School District No. 1, supra 579.

Here, in clear distinction to Smith, Thompson, and M.P., the Plaintiff requested a Due Process Hearing at a time when the District was responsible for providing M.M.

with such a Hearing.  This distinction is especially important since, given the relatively brief period of time in which M.M. was enrolled in a school outside of the District, it cannot fairly be said that the ALJ held the District liable for the unanticipated costs of problems with which it was totally unaware.  As such, under these circumstances, we concur with the ALJ, that M.M.'s three-week transfer to a school outside of the District, did not constitute a waiver of her right to obtain relief for IDEA violations that pre-dated the transfer.

> d.    <u>The Mediation Agreement</u>.  On March 28, 2005, the parties

entered into a Mediation Agreement which provided as follows:

> (1)  Regarding placement: parent will visit Barton & update Don Allen by 4/1/05; parent will register [M.M.] for Harry Davis school; Olson (Bill Smart) will set up a transition IEP meeting with Harry Davis prior to 4/18/05; (2) Bill Smart will notify prior to 4/1/05 [M.M.'s] bus driver that she sits in front; (3) the IEP team will address the transitions and modifications to the IEP in the following areas: behavior goals, adaptations, Behavior Intervention Plan, and will determine compensatory education (4) Barbara Muir will follow up with Kim Mesum prior to 4/15/05 regarding compensatory education; (5) Bill Smart will check on the implementation of progress reporting and report to the parent by 4/1/05; (6) Barbara Muir will discuss confidentiality with the administrative team prior to 4/1/05 (7)  Barbara Muir will send a memo to teachers prior to [illegible date] indicating that [M.M.] has permission to see Dr. Muir or Mr. Smart when she is feeling frustrated & has verbalized the need to her teacher.

[D. 5-6].

Subsequently, the District calculated that M.M. was entitled to 390 minutes of compensatory education for the 2004-05 school year; i.e., fifteen (15) minutes of service, multiplied by twenty-six (26) days.  [D. 1].

The District asserts that the Mediation Agreement precludes all compensatory education claims for the 2004-05 school year.  The ALJ rejected this argument, reasoning as follows:

> The mediation "agreement," by its own terms, is incomplete.  In addition, it does not address the issues for which compensatory relief is provided in this Decision. The district's failure to adequately review and revise the student IEP in March of 2004, and the impact of the serial suspensions on the student's education in the 2004-05 school year was not the subject of mediation, and the parent did not waive her right to compensatory education for those denials of FAPE by failing to raise those issues in mediation.

Kane Aff., Exh. 1, at pp. 25-26.

The District maintains that the ALJ erred in this conclusion, because, it asserts, the claims that were not raised in a mediation should be deemed waived for the purposes of subsequent litigation.  In making this argument, the District attempts to analogize the Mediation Agreement to Settlement Agreements, in the context of litigation.  Thus, the District asks that we find that the parties mediated, and agreed upon, 390 minutes of compensatory education for any missed services in the 2004-05 school year, through the date of mediation.  The Plaintiff counters that the absence of a waiver and release provision in the Mediation Agreement allowed her to seek compensatory education irrespective of the Agreement.

After reviewing the "agreement," the District's argument is clearly without merit. Nothing in the Mediation Agreement reflects that the parties agreed on any amount of compensatory education services that M.M. would receive. Moreover, while Smart's Hearing testimony reflects that he was under the impression that L.R. had agreed with Muir to the proposed number of compensatory minutes, [T. 484], L.R. unequivocally testified that she did not agree to the number of minutes that were proposed by the District. [T. 363-67]. Furthermore, the agreement does not contain any release, nor any other language, which could reasonably be construed as a restriction on the right of the Plaintiff to seek further redress, in the event that she was dissatisfied with the District's proposals.

To the extent that the Mediation Agreement between the parties can be analogized to a Settlement Agreement, the scope of the "agreement" is necessarily governed by principles of contract law. See, <u>Residential Funding Corp. v. Moore Financial</u>, 2006 WL 618119 at *5 (D. Minn., March 10, 2006)("Settlement agreements are a type of contract and are therefore governed by contract law."). It is a fundamental precept of contract law, that the parties to the contract are only bound by the terms of their agreement. As such, in the absence of an "agreement" between the parties concerning the number of compensatory minutes that would be provided M.M., or that satisfaction of the terms of the Mediation Agreement would preclude the Plaintiff from seeking relief for previous IDEA violations, we agree with the ALJ that

the Mediation Agreement does not preclude an additional award of compensatory benefits for the District's IDEA violations.

     e.    <u>The Violations of the IDEA</u>.

     1)    <u>Standard of Review</u>.   "Insofar as a State is required to provide a handicapped child with a 'free appropriate public education,' the Supreme Court has maintained that a State satisfies that requirement 'by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'"   <u>Hendrick Hudson District Board of Education v. Rowley</u>, supra at 203.   In delineating the standard by which to measure the adequacy of benefits provided under the IDEA, the Court settled upon a qualitative standard -- namely, that "some benefit" would have to result from the educational process.  <u>Id.</u> at 200.

    In this respect, "[t]he IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents." <u>Independent School District No. 283 v. S.D.</u>, supra at 878-79, quoting <u>Lenn v. Portland School Comm.</u>, 998 F.2d 1083, 1086 (1st Cir. 1993).  The IDEA does not require schools to "either maximize a student's potential or provide the best possible education at public expense," but only requires a school to "provide sufficient specialized services so that the student benefits from his education."  <u>Fort Zumwalt School District v. Clynes</u>, 119 F.3d 607, 612 (8th Cir. 1997), cert. denied, 523 U.S. 1137 (1998), citing <u>Hendrick Hudson District Board of Education v. Rowley</u>, supra at 203.  "Specific results are not required, 34 C.F.R. §300.350(b), and an IEP need

- 43 -

not be designed to maximize a student's potential 'commensurate with the opportunity provided to other children,' see Rowley, 458 U.S. at 189-198."  CJN v. Minneapolis Public Schools, supra at 642; see, Bradley ex rel. Bradley v. Arkansas Department of Education, supra at 974.

The IDEA requires that a disabled child be provided with access to FAPE.  See, Title 20 U.S.C. §1400(d)(1)(A); see also, Hendrick Hudson District Board of Education v. Rowley, supra at 203; Fort Zumwalt School District v. Clynes, supra at 610.  The purpose of the IDEA is to facilitate the provision of "a 'basic floor of opportunity' so that a child with disabilities has access to an individually designed education."  Stringer v. St. James R-1 School District, supra at 802, citing Yankton School District v. Schramm, 93 F.3d 1369, 1372 (8th Cir. 1996), citing, in turn, Hendrick Hudson District Board of Education v. Rowley, supra at 192.

All children with disabilities, including those suffering from a disability of M.M.'s nature, "who, by reason thereof, need special education and related services" are covered by the IDEA's protections.   Title 20 U.S.C. §1401(3)(A)(ii).  Those protections include "special education" and "related services," where "special education" is "specially designed instruction * * * to meet the unique needs of a child with a disability," while "related services" include "transportation, and such developmental, corrective, and other supportive services * * * as may be required to assist a child with a disability to benefit from special education * * *."  Title 20 U.S.C. §1401(26)(A) and (29).

FAPE, under the IDEA, is an educational experience which provides a disabled child with special education and related services that are tailored to that child's unique needs, by means of an IEP. See, Title 20 U.S.C. §1401(14). The IEP must include the child's present educational level and goals, specific services to be provided, needed transition services, and criteria for progress evaluation. See, Title 20 U.S.C. §1414(a)(1)(A). The IDEA is also designed to ensure that parents are afforded a meaningful opportunity to participate in the formulation of the IEP, and receive notice of any proposed changes in their children's educational programs. See, Title 20 U.S.C. §§1400(c)(5)(B) and 1414(a)(1)(D).

A parent who disagrees with a proposed IEP, or otherwise believes that his or her child's education falls short of the Federal standard, is entitled to a State Administrative Hearing. See, Title 20 U.S.C. §1415(f); see also, Fort Zumwalt School District v. Clynes, supra at 610. Under the IDEA, the administrative process is governed by State law. See, Independent School District No. 283 v. S.D., supra at 560. "Ultimately, after exhausting all administrative remedies provided by State law, an aggrieved party may file a civil action in State or Federal Court, to have the administrative determination judicially reviewed." Id.

2) <u>Legal Analysis</u>. Aside from the arguments that were previously addressed, the District has directly challenged the ALJ's finding that "the district ha[d] not offered or made available to the child a free appropriate public education in the least restrictive environment and the child suffered a loss of

educational benefit." See, <u>Minnesota Statutes Section 125A.09, Subdivision 21</u>. Our review of the ALJ's determination is necessarily deferential, as we are required to "give 'due weight' to the results of [the administrative proceedings], resisting any impulse to 'substitute [our] own notions of sound educational policy for those of the school authorities.'" <u>E.S. v. Independent School District, No. 196</u>, supra at 569, quoting <u>Hendrick Hudson District Board of Education v. Rowley</u>, supra at 206.

The ALJ determined that the District had deprived M.M. of a FAPE in several different respects. Specifically, the ALJ determined that the repeated suspensions of M.M., between January and April of 2005, constituted a change in placement, in violation of Title 20 U.S.C. §1415(j); that the District failed to provide services to the extent necessary to enable M.M. to appropriately progress in the general curriculum, and appropriately advance towards achieving the goals set forth in her IEP; that the District failed to review and revise M.M.'s IEP in March of 2004, when M.M. was transferred from Lucy Laney to Olson Middle School, and between January of 2005 and April of 2005; that the District failed to provide L.R. with written notice before eliminating M.M.'s speech services, in violation of Title 20 U.S.C. §1415(b)(3); and that the proposed IEP of March 9, 2005, was not reasonably calculated to achieve educational benefit, since it called for the placement of M.M. at the Jordan Park program, and since it required that M.M. continue to be subjected to the District's city-wide disciplinary policy.

The ALJ further concluded that the District's failings had resulted in a loss of education benefit to M.M., and that compensatory education services were necessary. In determining the amount of compensatory services that were required for the 2003-04 school year, the ALJ noted that, in the fall of 2004, M.M.'s IEP called for 120 minutes of services a day and, as such, the loss of ten (10) days of school would translate to twenty (20) hours of special education services. The ALJ's calculation appears to be predicated on her finding that "[i]t is a fair inference from the record that [M.M.] had more than ten days of suspension in the 2003-04 school year, and that the suspensions were numerous enough to impact her education." Kane Aff., Exh. 1, at p.6, ¶16.

The District contends that such a conclusion was in error since the Plaintiff failed to satisfy her burden concerning the suspensions, and that the ALJ could have ordered the District officials to testify concerning such suspensions. The District also contends that it was entitled to rely on Thompson, Smith, and M.P., and that, as a result, it could not have been required to proffer evidence concerning events which pre-dated M.M.'s re-enrollment in the District for the 2004-2005 school year.

As an initial matter, we conclude that the ALJ's finding, that M.M. was suspended for more than ten (10) days during the 2003-04 school year, is adequately supported by a preponderance of the evidence in the Record. Specifically, the Administrative Student Transfer Form, which is dated March 4, 2004, reflects that M.M. was suspended from February 13, 2004, until March 2, 2004, for a total of ten

(10) school days.  [D. 292, 666].  It also reflects that the suspension was M.M.'s second during the 2003-04 school year.  Furthermore, the FBA, which was conducted on December 13, 2004, reveals that M.M. had received twelve days of out-of-school suspension during her enrollment at Olson Middle School, [D. 227], and other records reflect that, as of December 13, 2004, only six (6) of those suspensions had occurred during the 2004-05 school year.  [D. 708, S. 199, 211].  As such, the Record demonstrates that M.M. was suspended for a minimum of sixteen (16) days during the 2003-04 school year.

The District has also challenged the ALJ's finding that the suspensions were numerous enough to impact upon M.M.'s education.  In support of the challenge, the District draws our attention to a Progress Report of June 1, 2004, which shows that M.M. made adequate academic progress during the 2003-2004 school year. [D. 306]  However, as referenced by the ALJ, the Report also reflects that M.M. made insufficient progress in her behavioral goal, and that absences due to suspensions were detrimental to M.M.'s learning.  [D. 306].  Accordingly, while there is certainly evidence that M.M. made academic progress during the 2003-04 school year, the ALJ's conclusion, that the suspensions were numerous enough to impact upon M.M.'s education, is supported by a preponderance of the evidence.

That being said, compensatory benefits are only proper where the ALJ "finds that the district has not offered or made available to the child a free appropriate public education in the least restrictive environment and the child suffered a loss of

educational benefit." Minnesota Statutes Section 125A.091, Subdivision 21. Accordingly, any award of compensatory benefits must be predicated on a failure of the District to satisfy its FAPE obligations. As it pertains to the award of compensatory benefits for the 2003-04 school year, the ALJ determined that the District deprived M.M. of a FAPE when it failed to review and revise M.M.'s IEP in March of 2004, following the suspension which had resulted in M.M. being transferred from the Lucy Laney Community School to Olson Middle School.[12]

The IDEA requires that the IEP team for a student with disabilities "review[] the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved; and * * * revise[] the IEP as appropriate to address * * * any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate." Title 20 U.S.C. §1414(d)(4)(A); see, 34 C.F.R. §300.343(c)(2). "The federal courts have said little on the failure to revise programs, but the school district **is** required to revise programs as appropriate." Kings Local School District, Board of Education v. Zelazny, 325 F.3d 724, 731 (6th Cir. 2003)[emphasis in original].

---

[12]The District contends that there is insufficient evidence, in the Record, to support a finding that the suspensions during the 2003-04 school year were numerous enough to constitute a change of placement, without parental consent, in violation of Title 20 U.S.C. §1415(j). However, we do not read the ALJ's opinion to make such a finding. On the contrary, the ALJ observed that incomplete disciplinary records rendered it impossible to determine whether the suspensions, that occurred in the Spring of 2004, amounted to a change of placement. Kane Aff., Exh. 1, at ¶10.

No progress reports appear in the Record for the time period between the implementation of M.M.'s IEP and BIP, on or around November 19, 2003, and M.M.'s transfer to the Olson Middle School, nor is there other sufficient evidence that M.M. was progressing appropriately towards her goals during that time. Instead, the Record reflects that, at the time of M.M.'s transfer to Olson Middle School, she had been suspended in excess of ten (10) days, and that her IEP team had determined her placement at the Lucy Laney Community School was inappropriate. In making that determination, the District did not re-evaluate M.M.'s IEP, or her BIP, nor did the District engage in any evaluation as to where an appropriate placement for M.M. would be. Given this Record, we agree with the ALJ that, between the implementation of the IEP of November 19, 2003, and M.M.'s administrative transfer to Olson Middle School, M.M. was failing to make adequate progress towards the goals of her IEP, and the District violated her FAPE rights when it did not review and revise M.M.'s IEP prior to the transfer. Our conclusion is further supported by evidence tending to show that M.M. received approximately six (6) days of suspension between the time of her transfer, and the end of the 2003-04 school year, and that the absences, which arose from the suspensions, interfered with M.M.'s learning.

The Record is devoid of any attendance records, or records of suspensions, that would clearly document when, and for how long, M.M. was suspended following the failure of the District to review and revise M.M.'s IEP in March of 2004. Other evidence is conflicting as to the number of days that M.M. was suspended during that

time period.  Notably, L.R. testified at the Hearing that, following the transfer, M.M. continued to be suspended on a weekly basis, and that the periods of suspension would range from two (2) to five (5) days, [T. 305], while the FBA of December 13, 2004, when read in conjunction with the suspension records for the 2004-05 school year, suggest that M.M. was suspended for a total of six (6) days between her transfer to Olson Middle School, and the end of the 2003-04 school year.  By all appearances, the ALJ estimated that the District's failure to review and revise M.M.'s IEP, prior to the administrative transfer to Olson Middle School, resulted in M.M. being subjected to ten (10) days of suspension.

Based on the testimony of L.R., the Progress Report of June 1, 2004, the FBA of December 13, 2004, and the absence of any affirmative evidence, such as attendance records, that M.M. was not suspended between March of 2004, and the end of the 2003-04 school year, we are satisfied, by a preponderance of the evidence, that M.M. was suspended following her transfer to the Olson Middle School in March of 2004, and that M.M. suffered a loss of educational benefit as a result.  However, in the absence of any additional evidence, we are in no better position than the ALJ to determine the number of days that M.M. was suspended between March of 2004, and the end of the 2003-04 school year.

While we share the ALJ's frustration with the inadequacy of the Record -- which places us in the tenuous position of attempting to glean the number of days that M.M. was suspended following her transfer of March 2004, from seemingly

incomplete records -- we are satisfied that the representations which were made in the

FBA Report of December 13, 2004, constitute an accurate assessment of M.M.'s

history of suspensions during her enrollment at Olson Middle School, at that time.[13]

[D. 227].  Reading this document -- which states that, at that time, M.M. had received

twelve (12) days of out-of school suspension during her enrollment at Olson Middle

School -- in conjunction with other records of suspension for the 2004-05 school year,

[D. 708, S. 199, 211] -- which reflect that six (6) of those suspensions occurred during

the 2004-05 school year -- we find, by a preponderance of the evidence, that M.M.

was suspended for a total of six (6) days between the time of her transfer to Olson

Middle School, and the end of the 2003-04 school year.  Accordingly, we recommend

that the ALJ's award of twenty (20) hours of compensatory education benefits, for the

2003-04 school year, be modified to twelve (12) hours of benefits.

The ALJ also awarded M.M. 168 hours of compensatory education benefits for

suspensions which occurred between January and April of 2005.  The ALJ's award

was predicated on her finding that M.M. had been suspended for approximately thirty-

---

[13]While not explicitly stated, the ALJ's award of compensatory benefits for ten
(10) days of suspension during the 2003-04 school year strongly suggests that she did
not credit L.R.'s testimony concerning the frequency of the suspensions.  According
to L.R.'s testimony, M.M. was suspended for anywhere from two (2) to five (5) days
each week that she was enrolled at the Olson Middle School during the Spring of
2004, and that, M.M. only attended approximately sixty (60) days of school during the
entire 2003-04 school year.  [T. 305-306].  Recognizing that the ALJ had an
opportunity to observe the demeanor of L.R., and the other witnesses, we decline to
credit L.R.'s testimony as articulating an accurate reflection of the frequency of
M.M.'s suspensions.

eight (38) days during the 2004-05 school year, and that the repeated suspensions of M.M., between January of 2005, and April of 2005, constituted a change of placement without parental consent, in violation of 20 U.S.C. §1415(j).  The ALJ calculated the award by multiplying the 360 daily minutes of special education services, that M.M. would have been entitled to in a Federal Setting III program, by the approximately twenty-eight (28) days of suspension which occurred between January and April of 2005.[14]

Title 20 U.S.C. §1415(j) requires that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."  A change of placement occurs if removal from school lasts more than ten (10) consecutive days, or if the child is subjected to a series of removals that constitute a pattern because they accumulate to more than ten (10) days, and

---

[14]The Record contains conflicting accounts of the number of days that M.M. was suspended between January and April of 2005.  [D. 708-09, S. 199, 211].  The testimony of Smart reflects that D. 708 is inaccurate to the extent that it reports that M.M. received homebound instruction from January 6, 2005, through January 20, 2005, [T. 127-128], and S. 199 does not include the suspension of January 21, 2005. Furthermore, S. 199 reflects that M.M. was suspended for two (2) days on February 28, 2005, while S. 211 suggests that the February 28 suspension lasted three (3) days, and D. 709 provides that M.M. was only suspended for one (1) day on February 28. Given those inconsistencies, it appears that M.M. was suspended  anywhere from twenty-five (25) to thirty (30) days between January and April of 2004.  Since neither party has challenged the ALJ's finding, as to the number of days that M.M. was suspended during this time period, we defer to the ALJ's finding that M.M. was suspended for twenty-eight (28) days between January and April of 2005.

because of factors such as the length of each removal, the total amount of time that the child is removed, and the proximity of the removals to each other.   34 C.F.R. §300.519.   The ALJ explicitly found that "[t]he repeated suspensions of M.M. for less than ten days between January 2005 and April 2005 constitute a pattern because they cumulate to approximately 30 days and because the length of each removal, the total amount of time that the student was removed, and the proximity of the removals to one another," and that "[t]hese repeated suspensions constitute a change of placement made by the district without the consent of the parent, in violation of 20 U.S.C. §1415(j)." Kane Aff., Exh. 1, at p. 19, ¶11.

The ALJ also noted that 34 C.F.R. §300.121(d) requires the District to provide certain services for periods of suspension that exceed ten (10) days.   In pertinent part, Section, 300.121(d)(2), provides as follows:

> In the case of a child with a disability who has been removed from his or her current placement for more than 10 school days in that school year, the public agency, for the remainder of the removals, must --
>
>> (i)    Provide services to the extent necessary to enable the child to appropriately progress in the general curriculum and appropriately advance toward achieving the goals set out in the child's IEP, if the removal is --
>>
>>> (A)   Under the school personnel's authority to remove for not more than 10 consecutive school days as long as that removal does not constitute a

- 54 -

> change of placement under §
> 300.519(b) (§ 300.520((a)(1)); or
>
> (B)   For behavior that is not a
> manifestation of the child's
> disability, consistent with
> §300.524.

The ALJ concluded that, despite her numerous suspensions, M.M. did not receive homebound instruction between January of 2005, and April of 2005. Furthermore, the ALJ determined that the District should have considered Setting III program alternatives outside of the District, in January of 2005, when the IEP team determined that placement in the Jordan Park program was not appropriate. [T. 121, 555-56].

The District's challenge to the ALJ's award of compensatory educational benefits for the 2004-05 school year is predicated, in part, on its assertion that it did not place M.M. in the Barton Open program because of L.R.'s persistent refusal to consent to placement in a Setting III program, and that its failure to provide homebound services for M.M. was a result of the absence of an agreement with L.R. concerning the number of hours of service per day. The District further maintains that the ALJ's determination, that M.M. was denied a FAPE by the District's persistent recommended placement of M.M. in the Jordan Park program, was not supported by evidence in the Record, and specifically, the assessment that was conducted by Ostrom. Lastly, the District urges that, in determining that the District had failed to provide M.M. with a FAPE, the ALJ failed to consider testimony from District

officials that an IEP team could modify the District's city-wide discipline policy for M.M.

Despite the District's arguments, we concur with the ALJ's conclusion that the District failed to provide M.M. with an FAPE between the months of January and April of 2005.  As noted by the ALJ, despite the District's conclusion that the least restrictive environment in which M.M. could be successful was a Setting III placement, the only Setting III placement that the District offered to M.M. was the Jordan Park program.  However, the Hearing testimony of Smart and Allen reflects that Smart, and possibly other members of M.M.'s IEP team, had concluded that Jordan Park would not be an appropriate placement for M.M., due to the high ratio of male to female students in that program, and M.M.'s history of sexually inappropriate behavior towards boys.  [T. 121-122, 556].  Accordingly, while a parent's refusal to agree to an appropriate placement might limit a finding that a school district denied a student an FAPE, see, e.g., CJN v. Minneapolis Public Schools, supra at 640, such a finding is inapplicable here, since the District never formally proposed an appropriate placement for M.M.

We are also unpersuaded by the District's argument that the ALJ failed to consider testimony from District officials that the District's city-wide discipline policy may be modified to meet the needs of individual students.  As an initial matter, we acknowledge Smart's testimony that, during an IEP team meeting of August 5, 2005, Sue Martin, who was apparently knowledgeable about the Barton Open program,

- 56 -

advised that the program followed the District's discipline policy, but that the policy could be modified to the needs of the child. [T. 446-48]. We also note that Allen similarly testified that the behavior policy at Barton Open would follow the city-wide disciplinary policy, but with adaptations or modifications as appropriate for the student. [T. 523]. However, Smart also testified that there was no discussion during the IEP team meeting about modifying the discipline policy for M.M., [T. 448], and in any event, each of the District's proposed IEPs, between January and April of 2005, clarified that M.M. would be expected to follow the District's city-wide disciplinary policy, although the length of the suspensions could be modified. [D. 158, 180].

Based on our review of the Record, and affording "due weight" to the findings of the ALJ, we concur with the ALJ that the preponderance of evidence supports a finding that the District failed to provide M.M. with a FAPE between the months of January and April of 2005. Specifically, we agree with the ALJ's conclusion that, by only offering the Jordan Park program, the District failed to provide M.M. with a sufficient level of services to receive a benefit from her education, and that the repeated suspensions during that time period constituted a change of placement without parental consent, in violation of Title 20 U.S.C. §1415(j). Therefore, we find

that the ALJ properly awarded 168 hours of compensatory education to M.M. for the suspensions which occurred between January and April of 2005.[15]

In sum, we conclude that the ALJ appropriately placed the burden of proof at the Administrative Hearing on the School District, in accordance with Minnesota law, and that the ALJ did not err in awarding compensatory benefits for FAPE violations which occurred prior to M.M.'s temporary transfer to the Colonel Charles Young Military Academy in September of 2004.  Additionally, we concur with the conclusion of the ALJ that the District deprived M.M. of an FAPE in March of 2004, when it administratively transferred M.M. to Olson Middle School without conducting an appropriate review of M.M.'s IEP, and again, in January of 2005, when it failed to offer an appropriate placement for M.M.  As a result of the District's failings, M.M. was suspended for approximately six (6) days in the Spring of 2004 -- which was after she had already been suspended in excess of ten (10) days during the 2003-04 school year -- and approximately twenty-eight (28) days between the months of January and April of 2005.  Therefore, we recommend that the District's Motion be granted, in part, such that the ALJ's award of twenty (20) hours of compensatory benefits for the

---

[15]In addition to the compensatory benefits discussed above, the ALJ awarded M.M. 330 minutes of compensatory benefits, which represents the remaining benefits that the District had agreed to provide M.M. as a result of the mediation.  The District has not articulated any ground upon which this award of benefits should be reversed and, therefore, our recommended award of benefits will include the 330 minutes of compensatory benefits that the District had previously agreed to provide to M.M.

2003-04 school year be reduced to twelve (12) hours, and that the Motion be denied in all other respects.

B.  The Plaintiff's Motion for Costs and Attorney's Fees.

1.  Standard of Review.  Section 1415(i)(3)(B)(i) governs the award of attorneys fees in actions to enforce rights under the IDEA and, in this respect, provides as follows:

> In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys fees as part of the costs * * * to a prevailing party who is the parent of a child with a disability.

A claim for attorneys' fees under the IDEA "is similar to the civil rights attorney's fees award statute, 42 U.S.C. §1988," and "should ordinarily be awarded to the prevailing party unless 'special circumstances exist to make an award unjust." Borengasser v. Arkansas State Board of Education, 996 F.2d 196, 199 (8th Cir. 1993); see, Peter By and Through Peter v. Wedl, 18 F. Supp.2d 1002, 1018 (D. Minn. 1998). Moreover, a party need not succeed on the main issue of the litigation to be considered as having "prevailed." Rather, "to qualify as a 'prevailing party' a plaintiff must obtain 'actual relief on the merits of his claim [that] materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." John T. ex rel. Robert T. v. Iowa Department of Education, 258 F.3d 860, 863-64 (8th Cir. 2001), quoting Farrar v. Hobby, 506 U.S. 103, 111-12 (1992). "A party prevails if it succeeded on any significant issue which achieved some of the

benefit it sought."  Yankton School District v. Schramm, 93 F.3d 1369, 1377 (8th Cir. 1996).

Nevertheless, "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); see also, Johnson v. Bismarck Public School District, 949 F.2d 1000, 1003 (8th Cir. 1991).  In making this determination, the "most critical factor is the degree of success obtained."  Hensley v. Eckerhart, supra at 436; see also,  Farrar v. Hobby, supra at 1114.  In this respect, the Supreme Court has explained:

> There is no precise rule or formula for making these determinations.  The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.  The court necessarily has discretion in making this equitable judgment.

Hensley v. Eckerhart, supra at 436-37.

Moreover, the IDEA's fee-shifting provision permits the Court to reduce the fee award if a party unjustifiably rejects an offer of settlement, or unreasonably protracts the litigation.  Title 20 U.S.C. §1415(i)(3)(D), (E), and (F).

2.  Legal Analysis.  The Plaintiff's Motion seeks attorney's fees and costs in the amount of $47,899.70, in addition to pre- and post-judgment interest in the amount of six (6) per cent, as the "prevailing party" in the underlying administrative action.  According to counsel for the Plaintiff, she expended 137.25 hours on behalf of the Plaintiff for the Administrative proceedings, at a rate of $250.00 per hour.

Amended Affidavit of Margaret O'Sullivan Kane ("Amended Kane Aff."), at ¶3. Additionally, counsel for the Plaintiff avers that a law clerk expended four (4) hours, at a rate of $100.00 per hour; a paralegal expended 8.5 hours, at a rate of $75.00 per hour; and that she incurred costs amounting to $216.20.  Id.  Thus, the total amount that is being sought for the prosecution of the Plaintiff's action at the administrative level is $35,566.20.

The Plaintiff also seeks costs and attorney's fees incurred in prosecuting her Petition for attorney's fees, and in defending against the District's appeal of the ALJ's award.  Specifically, counsel for the Plaintiff attests that she expended 47.5 hours,[16] in the prosecution of the pending fee Petition, and in defending against the District's appeal; that a paralegal expended .5 hours; and that she incurred costs amounting to $421.00, for a total of $12,333.50.  Id., at ¶4.[17]  Counsel for the Plaintiff further avers that, of the $12,333.50, $3,187.50 in attorney's fees -- 12.75 hours x $250.00 -- were incurred in the preparation, writing, and submission of the Plaintiff's Motion for Attorney's Fees and Costs, and the supporting Motion papers.

---

[16]The invoices that were submitted in support of counsel for the Plaintiff's claimed hours reflect that counsel for the Plaintiff expended 45.5, as opposed to 47.5 hours in prosecuting the pending fees Petition and defending against the District's appeal.  See, Amended Kane Aff., at Exh. 2.

[17]The fourth paragraph of the Amended Affidavit of Margaret O'Sullivan Kane was misnumbered as a second paragraph 3, and each subsequent paragraph appears to have been sequentially misnumbered.  All citations to the averments that are contained in this Affidavit will reflect the actual paragraph number, as opposed to the number which appears on the document itself.

The District opposes the Plaintiff's Motion on the ground that it, rather than the Plaintiff, was the prevailing party on the central issue of the administrative proceeding -- namely, the placement of M.M. in a Setting III program.  The District also contends that, aside from the award of compensatory education benefits, the Plaintiff gained little through the administrative proceedings.  Specifically, the District maintains that the ALJ's direction for the District to revise M.M.'s IEP, and to retain Ostrom for the purposes of revising M.M.'s BIP, cannot provide a basis for an award of attorney's fees and costs, since the District was already consulting with Ostrom, and since M.M.'s IEP would have been revised irrespective of the ALJ's ruling, as a result of any change in placement.

In support of its argument, the District relies heavily on the analysis of our Court of Appeals in Johnson v. Bismark Public School District, 949 F.2d 1000 (8th Cir. 1991), and that of the Court of Appeals for the Seventh Circuit, in Linda T. v. Rice Lake Area School District, 417 F.3d 704 (7th Cir. 2005).  In Johnson v. Bismark Public School District, supra at 1001, the plaintiff, who was dissatisfied with her son's IEP, hired an attorney, and arranged for a meeting with the defendant school district.  Following that meeting, the parties arranged for a second meeting to discuss the student's placement and program options.  Neither the plaintiff, nor her attorney, attended the second meeting but, instead, the plaintiff filed a Due Process Administrative Complaint, which sought the development of an IEP, and prospective compensatory education services for the then upcoming Summer.  Id. at 1001-02.

Subsequently, the parties entered into a Consent Decree, by which the school district agreed to develop a new IEP, and to allow the student's participation in an extended school year for the oncoming Summer.

The plaintiff subsequently filed a Federal action, which sought an award of attorney's fees under the IDEA. The District Court concluded that an award of attorney's fees was improper, and the Court of Appeals for the Eighth Circuit agreed. In so holding, the Court relied upon the evidence that the district had a practice of routinely reviewing all IEP's in the Spring of each school year, and that, since the plaintiff had not requested a special Summer program prior to filing her due process Complaint, she could not assume that an informal request for such services would have been futile. Id. at 1003. The Court further observed, as follows:

> While it would be excessively harsh to hold that [the plaintiff] was not a prevailing party at all, there was little gained by litigation that ended with a promise by the District to provide services that it had not previously refused to provide. Thus, we conclude that this was the kind of "limited success" that justifies a significant reduction in an attorneys' fee award.

Id., citing Hensley v. Eckerhart, supra at 440, and Max M. v. New Trier High School District No. 203, 859 F.2d 1297, 1301-02 (7th Cir. 1988).

Unfortunately for the District's argument, the present circumstances are plainly distinguishable from those present in Johnson. Specifically, unlike Johnson, the Plaintiff obtained relief that the District had previously refused to provide. Most significant was the ALJ's award of 193.5 hours of compensatory education benefits, which substantially exceeded the compensatory services that the District had agreed

to provide at all times prior to the ALJ's decision.  Furthermore, while the ALJ agreed with the District that, contrary to the Plaintiff's position, M.M. should be placed in a Setting III program, the ALJ ultimately determined that the District's proposed placement was not acceptable under the IDEA, and that the District had violated the IDEA by its failure to provide M.M. with a FAPE during certain specified periods in the 2003-04 and 2004-05 school years.

The District's reliance on the analysis of the Court in <u>Linda T. v. Rice Lake Area School District</u>, supra, is equally misplaced.  In <u>Linda T.</u>, the Court found that an award of attorney's fees was improper where the ALJ had determined that the defendant school district's placement of a student was proper, but that other portions of the student's IEP were insufficiently particular to satisfy the requirements of the IDEA.  <u>Id.</u> at 706-07.  In so holding, the Court recognized that, in requiring a more particularized IEP, the ALJ had not required the school district to provide any additional or different services to the plaintiff.  <u>Id.</u> at 708-09.  As a result, the Court determined that the degree of success that was obtained by the plaintiff was <u>de minimus</u>, and could not support an award of attorney's fees.  <u>Id.</u> at 709.

Here, in contrast to <u>Linda T.</u>, the ALJ directed the District to provide additional services to M.M. -- namely, placement at the Barton Open program, and compensatory education services beyond those which the District had previously agreed to provide -- and those services clearly exceeded the <u>de minimus</u> relief that was afforded in both <u>Linda T.</u>, and <u>Johnson</u>.   Accordingly, after considering each area

in which the Plaintiff successfully obtained relief in the administrative proceedings, we find that the Plaintiff was the "prevailing party" for the purposes of Section 1415(i)(3)(B)(i), and that the degree of her success was sufficient to support an award of costs and attorney's fees.

The District also urges that the award of attorney's fees should be reduced given the similarity of the relief that was obtained by the Plaintiff, and the District's Offer of Settlement.  See, Title 20 U.S.C. §1415(i)(3)(D)(i)(providing that no award may be made for services performed subsequent to the time of a written offer of settlement, if the offer is timely made, not accepted within ten days, and the relief finally obtained is not more favorable than the offer of settlement); Warner by Warner v. Independent School District No. 625, 134 F.3d 1333, 1338 (8th Cir. 1998)(if relief afforded by Hearing Officer "differed very little from what the School District offered in settlement before the administrative hearing," it is "highly relevant to the fee award issue.").  Here, however, the ALJ provided M.M. with 193.5 hours of compensatory services, which was substantially more than the 21.5 hours of compensatory education services that were offered in the District's Offer of Settlement.[18]  Therefore, we decline to impose any limit on the award of costs and attorney's fees by the District's Offer of Settlement.  See, Capistrano Unified School District v. Wartenburg By and Through

---

[18]The District offered 15 hours of compensatory education benefits in addition to the amounts that were offered in the Mediation Agreement.  Based on the District's representations, 390 minutes, or 6.5 hours, of compensatory benefits were agreed to in the Mediation Agreement.

Wartenburg, 59 F.3d 884, 897 (9th Cir. 1995)(not an abuse of discretion to award attorneys fees where administrative ruling was more favorable than an Offer of Settlement).

Nonetheless, the Plaintiff was not entirely successful at the administrative level. Notably, the ALJ declined to place M.M. in the STRIVE program, which is located outside of the District in Independent School District No. 287, as was advocated by the Plaintiff.[19] See, Attachment to Letter of August 24, 2005 from Margaret O'Sullivan Kane to Kathleen Sheehy, at p. 30, Administrative Record, at Inventory Item No. 5. In seeking such relief at the administrative level, the Plaintiff maintained that placement at Barton's Open was improper. See, Id. at p. 17. Similarly, the ALJ declined to accept the Plaintiff's position that the District had denied M.M. a FAPE from May of 2003, until at least August 22, 2005, or grant the Plaintiff's request for a total of 372 hours of compensatory education benefits, which was predicated on the Plaintiff's assertion that M.M. had been in an inappropriate placement since September 13, 2002, and that M.M. had missed 33 days of school during the 2004-05 school year, as well as 121 days of school during the 2003-04 school year. Id. at p. 26

Our review of the Record discloses that a sizable amount of resources were dedicated to advancing such positions as M.M.'s placement in the STRIVE program, as opposed to a Setting III program, and in other respects, which proved ultimately

------

[19]The STRIVE program appears to be a Federal Setting IV program. [T. 637].

to be unsuccessful. See, <u>Letter of August 8, 2005 from Margaret O'Sullivan Kane to Laura T. Booth</u>, at p. 1, <u>Administrative Record</u>, at Inventory Item No. 16; [T. 613-15, 629-30, 655-59]. Accordingly, some reduction in the Plaintiff's award of fees is warranted. Based upon the present submissions, it is impossible to determine which of the Plaintiff's claimed hours were dedicated to advancing positions that proved to be unsuccessful. Recognizing the absence of any precise formula for determining an appropriate reduction, we recommend that the Plaintiff's award of attorney's fees be reduced by fifteen (15) per cent. We do so on the basis of the Record presented, acknowledging that our assessment is judgmental, based upon a close review of the Record in total, and the applicable precedents, and is not couched in terms of arithmetic precision. See, e.g., <u>Hensley v. Eckerhart</u>, supra at 436-437 ("There is no precise rule or formula for making these [fee] determinations," but "[a] request for attorney's should not result in a second major litigation.").[20] Simply stated, the Plaintiff should not be rewarded, with attorney's fees, on issues as to which she was not successful at the administrative level.

_____

[20]Considering that our reduction in the award of attorney's fees is based on the Plaintiff's lack of success in several aspects of her case at the administrative level, and is not related to her prosecution of the pending fee Petition, or the defense against the District's appeal, we apply the fifteen (15) percent reduction solely to the fees which are being sought for work performed during the administrative proceeding. The Plaintiff's unsuccessful efforts, during the administrative process, were not advanced in the proceedings before this Court -- at least in the sense of seeking a reversal of the ALJ's rejection of those efforts -- and therefore, it would be inappropriate to reduce the Plaintiff's requested attorney's fees for any of counsel's work as to the District's subsequent appeal, or the Plaintiff's fee Petition.

Counsel for the Plaintiff has provided an itemized listing of her fees and costs that were associated with the prosecution of this action. As is pertinent to our analysis, counsel for the Plaintiff purports to have incurred $35,350.00 in attorney's fees, and $216.20 in costs, in the underlying administrative proceedings.[21] The District has challenged the Plaintiff's entire claim for costs, in the administrative proceedings, which includes $29.00 in witness fees for M.M., and $187.20 in "Courier Service" costs. See, Amended Kane Aff., at Exh. 1. Specifically, the District challenges counsel for the Plaintiff's claim for witness fees for M.M., who did not testify, upon the ground that there is no evidence that either of the two witnesses who were called by the Plaintiff -- Ostrom and L.R. -- actually expended the $29.00 that is being sought, and the claim for courier expenses, on the ground that such expenses are not recoverable under Title 28 U.S.C. §1920.

The Plaintiff has not responded to the District's recommended reductions -- reductions which we find to be warranted. Specifically, considering that M.M. did not

---

[21]In their Complaint, the Plaintiff seeks an additional $700.00 in expert witness fees for Ostrom's testimony at the Administrative Hearing. Complaint, at ¶15. The District has specifically contested this request, on the ground that an award of expert witness fees, beyond the amount established by Title 28 U.S.C. §§1920(3), and 1821(b). See, Arlington Central School District Board of Education v. Murphy, --- U.S. ----, 2006 WL 1725053 at *6 (U.S., June 26, 2006); Neosho R-V School District v. Clark, 315 F.3d 1022, 1031 (8th Cir. 2002). While we agree with the District that an award to the Plaintiff of $700.00 for expert witness fees would be improper, our review of the Plaintiff's itemization fails to disclose any claimed expense for Ostrom's expert testimony. Accordingly, it appears that the Plaintiff has properly abandoned her request to be reimbursed for Ostrom's expert fees.

- 68 -

testify, and the absence of any apparent expenses incurred by any of the Plaintiff's other witnesses, it is not possible to determine whether the Plaintiff's request for $29.00 in "witness expense" is reasonable.   Moreover, courier expenses are not taxable as "costs," for the purposes of Section 1920, but are instead "out-of-pocket" expenses. See, Martino v. United States, 2002 WL 459469 at *4 (D. Minn., March 20, 2002), citing Hollenbeck v. Falstaff, 605 F. Supp. 421, 439 (D. Mo. 1984), aff'd, 780 F.2d 20 (8th Cir. 1985).   Therefore, the Plaintiff is not entitled to any of the $216.20 in costs that she seeks to recover from the administrative proceedings.

The Plaintiff has also identified $421.00 in costs that were associated with the prosecution of her fee Petition.   See, Amended Kane Aff., at ¶4.   While those costs have not been specifically challenged by the District, it appears that $171.00 of those costs were dedicated to "Courier Service," while the remaining $250.00 was attributable to the payment of the Clerk of Court's filing fee. Id. at Exh. 2.   Filing fees paid to the Clerk of Court are taxable as costs.   See, Title 28 U.S.C. §1920(1). However, since the expenses associated with courier service are not taxable, we find that the Plaintiff's total recoverable costs are $250.00.

Additionally, the District has specifically challenged the propriety of an award of attorney's fees for the 1.75 hours that were expended by counsel for the Plaintiff in relation to an IEP meeting that was conducted on August 5, 2005.   Specifically, the District notes that, under Title 20 U.S.C. §1415(i)(3)(D)(ii), "[a]ttorneys' fees may not be awarded relating to any meeting of the IEP Team unless such meeting is convened

as a result of an administrative proceeding or judicial action, or, at the discretion of the State, for a mediation described in subsection (e) of this section." The provision "prohibits recovery of fees associated with IEP meetings unless the meeting is convened by order of a court or administrative agency." <u>Linda T. v. Rice Lake Area School District</u>, supra at 709.

The District contends that any fees associated with the IEP meeting of August 5, 2005, are not recoverable, as the meeting was not conducted pursuant to the request of the ALJ, but was a result of L.R.'s request for an IEE. The Plaintiff has not responded to the District's argument, nor is it apparent from the Record that the IEP meeting was conducted pursuant to an Order of the ALJ. Therefore, we find that a reduction of the Plaintiff's claimed attorney time, by 1.75 hours, is proper.

As noted, the Plaintiff requested award of attorney's fees was calculated based on counsel for the Plaintiff's asserted rate of $250.00 per hour. Fee calculations, under the IDEA, "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished," <u>Title 20 U.S.C. §1415(i)(3)(C)</u>, and the Court may reduce an award of attorney's fees, where the rate "unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience." <u>Title 20 U.S.C. §1415(i)(3)(F)(ii)</u>.

In support of her assertion, that her rate of $250.00 per hour is reasonable, the Plaintiff has submitted the Affidavits of Tammy L. Pust ("Pust"), and Amy J. Goetz

("Goetz"), who are both attorneys who practice in the area of special education law. See, Affidavit of Tammy L. Pust ("Pust Aff."), at ¶2; Affidavit of Amy J. Goetz ("Goetz Aff."), at ¶2. According to each of those Affidavits, as well as the Affidavit of counsel for the Plaintiff, special education law is a highly specialized area of practice that requires knowledge of a complicated convergence of State, Federal, and Administrative law. See, Pust Aff., at ¶3; Goetz Aff., at ¶3; Kane Aff. at ¶6. Goetz further avers that her average hourly rate for representation in special education cases is $250.00 per hour, and that the plaintiffs' bar, in special education cases, bills at a rate of between $200.00 and $250.00 per hour. Goetz Aff., at ¶4. Pust avers that her average hourly rate for special education cases is $200.00 per hour. Pust Aff., at ¶4.

The District does not appear to challenge the $250.00 per hour rate that counsel for the Plaintiff is requesting. However, under substantially similar circumstances, a Court within this District recently determined that counsel for the Plaintiff's hourly rate of $250.00 "unreasonably exceed[s] the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience." See, J.T. v. Independent School District No. 701, Civ. No. 05-1640, at p. 7 (D. Minn., April 17, 2006)("J.T. II"), citing Title 20 U.S.C. §1415(i)(3)(F)(ii). There, the Court was presented with substantially the same averments of Goetz and Pust, and determined that the reasonable rate for counsel for the Plaintiff's services, in a special education case, was $220.00 per hour. Counsel for the Plaintiff has not presented any circumstances that would distinguish this case from J.T. II, for the

purposes of determining an appropriate hourly rate under Section 1415(i)(3)(C). Therefore, guided by the Court's determination in <u>J.T. II</u>, we find that the $220.00 is a reasonable hourly rate for the services rendered by counsel for the Plaintiff.

Counsel for the Plaintiff has averred that she bills paralegal services at a rate of $75.00 per hour, and law clerk services at a rate of $100.00 per hour. An award of attorney's fees may include work performed by paralegals or law clerks. See, <u>Missouri v. Jenkins</u>, 491 U.S. 274, 286 (1989); see, e.g., <u>Blackman v. District of Columbia</u>, 397 F. Supp.2d 12, 17 (D. D.C. 2005). While no Affidavits or other evidence was offered as to the reasonableness of such rates, our experience suggests that such rates are, in fact, reasonable. Accordingly, in the absence of any objection from the District, our recommended award of fees will include paralegal services at a rate of $75.00 per hour, and law clerk services at a rate of $100.00 per hour.

Applying the identified reductions, we recommend that the Plaintiff be awarded costs and attorney's fees in the total amount of $36,517.88. In arriving at this figure, we have calculated the Plaintiff's entitlement to fees from the prosecution of the administrative proceeding, separately from those costs and fees which were incurred in the prosecution of the Plaintiff's fee Petition, and in defense of the District's appeal. In calculating the appropriate award of fees for the Plaintiff's prosecution of the administrative proceeding, we have subtracted the 1.75 hours that were expended in relation to the IEP meeting of August 5, 2005, from the 137.25 hours that were expended by counsel for the Plaintiff, for a total of 135.5 hours. We then multiplied

the 135.5 hours expended by counsel for the Plaintiff in the prosecution of the administrative proceedings by the reasonable rate of $220.00, for a total of $29,810.00.

To this amount, we have added the fees resulting from work performed by the support staff of counsel for the Plaintiff. Specifically, we have multiplied the 8.5 hours of paralegal services rendered during the representation at the administrative proceedings by the rate of $75.00, for a total of $637.50. We have also multiplied the rate of $100.00 per hour by the 4 hours that were expended by a law clerk in the underlying administrative proceedings, for a total of $400.00. Adding each of these figures together, we determined that the Plaintiff incurred attorney's fees in the amount of $30,847.50, in the prosecution of the administrative proceeding. After reducing this figure by fifteen (15) per cent -- in order to account for the unsuccessful claims -- we find that the Plaintiff is entitled to reasonable attorney's fees in the amount of $26,220.38, for the prosecution of the administrative proceedings.

Using a similar method of calculation, we find that the Plaintiff is entitled to an award of $10,047.50 in attorney's fees for the prosecution of the fee Petition, and the defense of the District's appeal. In arriving at this figure, we have multiplied the 45.5 hours that were expended by counsel for the Plaintiff in her prosecution of the pending fee Petition, and in defense of the District's appeal, by the reasonable rate of $220.00, for a total of $10,010.00.[22] To this figure, we have added $37.50, which represents

---

[22]Again, see <u>footnote 16</u>, supra, while the Plaintiff's counsel has averred to
(continued...)

the fees incurred for the .5 hours of paralegal services that were incurred by the Plaintiff, at a rate of $75.00 per hour.

Adding the award of $26,220.38 in attorney's fees for the prosecution of the administrative proceeding, with the award of $10,047.50 in attorney's fees for the prosecution of the fee Petition, and defense of the District's appeal, we find that the Plaintiff is entitled to a total award of fees in the amount of $36,267.88. The Plaintiff is also entitled to $250.00 in costs, for a total award of $36,517.88 in costs and attorney's fees. We expressly find that such an award of fees and costs is reasonable under governing precedents of law.

The Plaintiff has also requested pre-judgment and post-judgment interest in the amount of six (6) per cent. An award of interest in Federal civil actions is ordinarily governed by Title 28 U.S.C. §1961(a), which provides as follows:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment.

---

[22](...continued)
expending 47.5 hours in her prosecution of the fee Petition, and in defense of the District's appeal, see, Amended Kane Aff., at ¶4, the invoices that were presented in support of the Motion only account for 45.5 hours. See, Id., at Exh. 2.

As such, "[p]ost-judgment interest is appropriate when a district court enters judgment awarding reasonable attorney's fees under the IDEA." <u>Kaseman v. District of Columbia</u>, 329 F. Supp.2d 20, 28 (D. D.C. 2004); see, e.g., <u>J.T. II</u>, supra at p. 12; <u>Blackman v. District of Columbia</u>, 390 F. Supp.2d 16, 20 (D. D.C. 2005).

"The award of prejudgment interest is generally entrusted to the district court's discretion." <u>EFCO Corp. v. Symons Corp.</u>, 219 F.3d 734, 742 (8th Cir. 2000). Exercising that discretion, the Court, in <u>J.T. II</u>, supra at p. 12, recently denied a similar request for pre-judgment interest, while other Courts have awarded prejudgment interest in special education cases. See, <u>Kaseman v. District of Columbia</u>, supra at 28; <u>Halbrook v. District of Columbia</u>, 305 F. Supp.2d 41, 48 (D. D.C. 2004).

In both <u>Kaseman</u> and <u>Halbrook</u>, the Court awarded pre-judgment interest after considering the viability of the defendants' opposition to the fee Petition; the conduct of the defendants, and any resulting delay that has resulted in payment for legal services; and whether the defendants had engaged in "unreasonable penny-pinching scrutiny," which they found "produces serious chilling effects on the availability of competent, experienced attorneys to serve" IDEA . See, <u>Halbrook v. District of Columbia</u>, supra at 47-48; <u>Kaseman v. District of Columbia</u>, supra at 28-29. The determination that pre-judgment interest was proper, in those cases, was predicated upon findings that the arguments of the defendants either "bordered on the absurd" or were "frivolous"; that the defendant's had completely "stonewalled" the plaintiff's

requests for payment; and that the defendants had engaged in "unreasonable penny-pinching scrutiny," in addressing the plaintiff's requests for fees.  Id.

The circumstances here are materially distinguishable from those present in both Halbrook and Kaseman.  Notably, the District's failure to settle the Plaintiff's request for attorney's fees appears to be a product of its good-faith appeal of the ALJ's Order, as well as its belief that the ALJ's placement of M.M. in a Setting III program rendered any award of attorney's fees improper.  While our Recommendation, if adopted, would render the District's appeal largely unsuccessful, and would require an award of attorney's fees, the District's arguments were neither "frivolous" nor "absurd," but instead, were reasonably based in law and fact and involved contested issues which have a reasonable basis in fact and law.  As such, the District cannot be said to have stonewalled the Plaintiff's entitlement to costs and attorney's fees.  Moreover, at least some of the District's positions were meritorious, and have resulted in a Recommendation that the Plaintiff's requested award of costs and attorney's fees be reduced appreciably.

Of course, we recognize the importance of awarding attorney's fees in ensuring the enforcement of the IDEA, and accept that delays in the payment of attorney's fees may "discourage lawyers who do such important work by failing to pay them for their services in a timely fashion."  Id. at 48.  Nevertheless, considering the reasonable basis for the District's opposition to the Plaintiff's requested fee award, as well as the meritorious nature of some of the District's legal arguments, we find that a balancing

- 76 -

of the equities does not support an award of pre-judgment interest.  Therefore, we recommend that the Plaintiff's Motion for an Attorney's Fees and Costs be granted, in part, such that the Plaintiff should be awarded a sum of $36,517.88 in costs and attorneys fees, plus post-judgment interest calculated in the manner provided for under Title 28 U.S.C. §1961.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the School District's Motion for Summary Judgment [Docket No. 7] be granted, in part, and denied, in part, as further discussed in the text of this Order.

2.     That the Plaintiff's Motion for Costs and Attorney's Fees [Docket No. 23] be granted, in part, as further discussed in the text of this Order.

3.     That the Plaintiff  be awarded $36,517.88 in costs and attorney's fees, plus post-judgment, calculated in the manner provided under Title 28 U.S.C. §1961.

Dated: July 18, 2006                    s/Raymond  L. Erickson

                                        Raymond L. Erickson
                                        CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 4, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 4, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.